# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF KENTUCKY
# OWENSBORO DIVISION

| | |
|---|---|
| **CALEB H. MAY,** | ) |
| *Plaintiff*, | ) |
| -vs- | ) |
| **HENDERSON COUNTY PUBLIC LIBRARY,** | ) |
| **JOAN HOFFMAN,** Individually and in her Official Capacity as Trustee, | ) |
| **SUSAN THURMAN,** Individually and in her Official Capacity as Trustee, | ) Case No. 4:20-CV-108-JHM |
| | ) **JURY DEMAND** |
| **STEVE TWEDDELL,** Individually and in his Official Capacity as Trustee, | ) |
| **BOBBIE JARRETT,** Individually and in her Official Capacity as Trustee, | ) |
| And | ) |
| **ARLENE ALEXANDER,** Individually and in her Official Capacity as Trustee, | ) |
| *Defendants.* | ) |

## VERIFIED COMPLAINT

Speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection.

---*Snyder v. Phelps*, 131 S.Ct. 1207, 1211, 562 U.S. 443, 444 (U.S. 2011).

# I. INTRODUCTION

1. Plaintiff Caleb H. May brings this action against the Henderson County Public Library and its Trustees, each in their individual and official capacities, pursuant to 42 U.S.C. § 1983 for redress of wrongs committed by the Defendants and for compensation for injuries arising out of the Defendants' intentional deprivation of his constitutionally protected rights under the First and Fourteenth Amendments to the United States Constitution. Specifically, the Plaintiff sues the Defendants for their retaliation against him for the exercise of his freedom of expression as a private citizen and for his religious and political commentary on social media regarding matters of public concern.

2. Plaintiff seeks declaratory relief, injunctive relief, nominal damages, compensatory damages and reasonable attorney's fees and costs as permitted by 42 U.S.C.§ 1988.

# II. JURISDICTION AND VENUE

3. Jurisdiction is vested in this Court to hear and decide all issues presented in this case pursuant to 28 U.S.C. § 1331 and 1343, this case being predicated on a federal question and the enforcement of certain federal constitutionally protected rights as guaranteed under the First and Fourteenth Amendments of the United States constitution.

4. The Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202.

5. Venue is proper in this Court under 28 U.S.C.§ 1491(b), as the Plaintiff and the Defendants reside or are situated within this federal district and the Defendants' wrongful conduct took place within this federal district.

# III. PARTIES

6. Caleb H. May is an adult citizen and resident of Henderson, Henderson County, Kentucky, and is the Director of the Henderson County Public Library.

7. The Henderson County Public Library ("the Library") is a governmental entity created pursuant to KRS 173.310.

8. Joan Hoffman ("Hoffman") is an adult citizen and resident of Henderson, Henderson County, Kentucky, and is a duly-appointed Trustee of the Henderson County Public Library; Hoffman serves as President of the Board of Trustees.

9. Susan Thurman ("Thurman") is an adult citizen and resident of Henderson, Henderson County, Kentucky, and is a duly-appointed Trustee of the Henderson County Public Library; Thurman serves as Secretary of the Board of Trustees.

10. Steve Tweddell ("Tweddell") is an adult citizen and resident of Henderson, Henderson County, Kentucky, and is a duly-appointed Trustee of the Henderson County Public Library; Tweddell serves as Treasurer of the Board of Trustees.

11. Bobbie Jarrett ("Jarrett") is an adult citizen and resident of Henderson, Henderson County, Kentucky, and is a duly-appointed Trustee of the Henderson County Public Library.

12. Arlene Alexander ("Alexander") is an adult citizen and resident of Henderson, Henderson County, Kentucky, and is a duly-appointed Trustee of the Henderson County Public Library.

## IV. FACTS

13. May is thirty-eight years of age and resides in Henderson, Kentucky.

14. May is married to Sarah May and they have six children ranging in age from four to thirteen years.

15. May graduated with honors from Washburn University in 2006 with a degree in Political Science and a minor in History.

16. May graduated from Emporia State University in 2010 with a Masters of Library Science.

3

17. From 2010 to 2015, May served as the Director of the Meade Public Library in Meade, Kansas.

18. In 2015, May left his position at the Meade Public Library to take his current position as Director of the Henderson County Public Library ("the Library").

19. The Library was created pursuant KRS 173.310 and is, therefore, a governmental entity.

20. Hoffman, Thurman, Tweddell, Jarrett and Alexander were each appointed to serve as Trustees of the Library and are, therefore, governmental actors.

21. May was hired by the Library to serve as its Director under the terms of a written employment agreement that was entered into on July 29, 2015.[1]

22. The initial term of May's employment agreement was one (1) year, beginning on September 1, 2015 and ending on August 31, 2016, renewable for an unlimited number of subsequent one (1) year terms.

23. May's employment agreement with the Library was renewed in 2016, 2017, 2018 and 2019.

24. Based upon events described in this Complaint, the Board of Trustees of the Library has determined that May's contract will not be renewed upon expiration of the current term, which ends on August 31, 2020, an act of retaliation against May for exercising his right to free expression under the 1st and 14th Amendments to the United States Constitution.

25. The first half of 2020 has been one of the most eventful in United States history.

26. The year began with the impeachment trial in the United States Senate of President Donald J. Trump.

---

[1] A copy of the Henderson County Public Library Employment Agreement is attached as Exhibit 1.

27. After the acquittal of President Trump, national attention soon shifted to the global Covid-19 Pandemic.

28. The Pandemic has prompted the global shutdown of schools, businesses, sporting events, religious gatherings and most forms of entertainment on an unprecedented scale.

29. On March 16, 2020, in anticipation of the Executive Orders of Kentucky Gov. Andy Beshear, the Library closed to the public and many of its employees were unable to perform their usual duties.

30. During the shutdown, May continued to carry out his usual responsibilities at the Library, as well as many others, including: 1) emptying the drop box (where books are returned to the Library); 2) reshelving books; 3) performing janitorial services; 4) communicating with the public about the status of Library services; 5) promoting the Library's online services; 6) maintaining compliance with ever-evolving government guidance related to the pandemic; 7) continuing to oversee an eight million dollar expansion to the Library facility; 8) working with Library staff to comply with Gov. Beshear's "Healthy at Work" initiative; and 9) supervising the reopening of the Library on June 2, 2020.

31. Throughout the difficulties wrought by the pandemic, May has faithfully and effectively performed his duties at the Library.

32. Governmental action in response to the Covid-19 shutdown has caused growing tension between those who favor aggressive countermeasures and those who believe that a severe economic downturn poses an even greater long-term risk to the health of U.S. residents.

33. In addition to pandemic-related tension, there is sharp partisan divide in the United States.

34. Many observers of culture believe that the United States is undergoing changes that are reshaping the country in profound ways.

35. On May 25, 2020, in the midst of these national tensions, George Floyd, an African American man, was killed in Minneapolis by a police officer who knelt on his neck for nearly eight minutes, ignoring Floyd's statements that he could not breathe.

36. Bystanders who witnessed the killing of George Floyd captured the event on video and released the footage on May 26, 2020.

37. The death of George Floyd sparked nationwide protests regarding racial injustice in the United States, in general, and the deaths of a number of African American men at the hands of law enforcement, in particular.

38. While the protests began peacefully, they quickly escalated into riots, looting and violence.

39. The various responses to the riots have served to deepen divisions in the United States, especially with regard to matters of racial injustice.

40. One organization that has played a prominent role in the protests is Black Lives Matter ("BLM").

41. BLM was formed in 2013 following the controversial acquittal of George Zimmerman in connection with the death of Trayvon Martin, an African American teenager.

42. BLM's self-described mission is "to eradicate white supremacy and build local power to intervene in violence inflicted on Black communities by the state and vigilantes."[2]

43. BLM further describes its beliefs, in part, as follows:[3]

   a. "Struggling together," "imagining and creating a world free of anti-Blackness, where every Black person has the social, economic, and political power to thrive"; and

   b. "We disrupt the Western-prescribed nuclear family structure requirement by supporting each other as extended families and "villages" that collectively care for one another, especially our children, to the degree that mothers, parents, and children are comfortable."

---

[2] https://blacklivesmatter.com/what-we-believe/
[3] Id.

6

44. In addition to these views, BLM advocates for defunding the police, as illustrated by the following statement: "We know that police don't keep us safe — and as long as we continue to pump money into our corrupt criminal justice system at the expense of housing, health, and education investments — we will never be truly safe."[4]

45. One of the more controversial positions that BLM takes is that "white supremacy" is a widespread problem in the United States.

46. It is within this cultural milieu that May chose to exercise one of the most coveted rights that a person in the United States possesses: the right to free speech.

47. In particular, on May 31, 2020, May chose to speak out in a FaceBook post to share his personal religious views about the racial division in our country, as follows:



---

[4] https://blacklivesmatter.com

48. In addition to addressing the issue of race, May also spoke out about the political divide concerning Covid-19; in particular, he observed that many who advocate extreme social distancing were silent in the face of crowded protests following the death of George Floyd:



49. May then took aim at the logical and moral inconsistency between stating that "black lives matter" while tolerating high rates of abortion and other threats to the African American community:



50. May then posted the cartoon below to express his conviction that the notion of "white privilege" is itself grounded in racial animus and runs counter to the principle that people should be judged based upon "the content of their character, not the color of their skin":[5]



51. May made all of these posts on his personal FaceBook page and did not in any way identify himself in the posts as being affiliated with the Library.

52. May's purpose in making all of these posts was to express views that are commonly-held among many people of good conscience, including the idea that classifying people according to their skin color is divisive and contrary to Biblical truth.

53. Racial division in the United States is a matter of public interest.

54. Political division in the United States is a matter of public interest.

55. Speaking out in support of the unborn is a matter of public interest.

---

[5] See https://www.americanrhetoric.com/speeches/mlkihaveadream.htm. This well-known phrase is from Dr. Martin Luther King's "I Have a Dream" speech, delivered on August 28, 1963, at the Lincoln Memorial, Washington D.C. The full quote is as follows: "I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."

56. Public policy regarding the Covid-19 Pandemic is a matter of public interest.

57. On Wednesday, June 3, 2020, May learned that a number of individuals had misconstrued his posts and some were leveling against him one of the most serious allegations that can be made against a person—that he was a racist.

58. The notion that May is a racist is belied by his strongly held Christian convictions and his past involvement in political campaigns on behalf of prominent African American politicians such as J.C. Watts and Dr. Alan Keyes.

59. Much to May's surprise, some of the individuals who had misconstrued his posts were responding by demanding that he be fired from his position as Director of the Library.

60. On the afternoon of June 3, 2020, Hoffman and Thurman came to the Library to meet with May concerning his FaceBook posts.

61. Hoffman indicated to May that the Trustees had received complaints from members of the Henderson community concerning his posts.

62. Hoffman stated to May that she understood that he was entitled to express his opinions, an apparent acknowledgment of his 1st Amendment right to free expression.

63. Hoffman, joined by Thurman, also made clear to May that she was not asking him to remove his FaceBook posts, another apparent acknowledgment of his 1st Amendment right to free expression.

64. On Thursday, June 4, 2020, May drafted a statement explaining the purpose of the posts and read it to each of the Trustees individually by telephone.[6]

65. Later on the afternoon of June 4, 2020, May delivered the statement to Library staff explaining the purpose of the posts and urged any who were concerned to come and meet with him—consistent with his long-established open door policy.

---

[6] A script of May's statement to Library employees is attached as Exhibit 2.

66. On Friday, June 5, 2020, May went to the home of Hoffman to deliver a document unrelated to the FaceBook issue.

67. May expected his visit with Hoffman to be brief, but it turned into an hourlong conversation.

68. Even though May and Hoffman hold widely differing political views, they were able to converse in a civil and respectful manner.

69. May left the conversation with Hoffman feeling as though she understood his intentions and knew that he was not a racist.

70. Hoffman frequently expresses her progressive political views on FaceBook, including prevailing progressive views on matters of race, the Covid-19 Pandemic and President Donald Trump.

71. On the evening of Friday, June 5, 2020, Henderson City Manager Buzzy Newman contact May and directed him to be at the Library on the following day to assure that it was not damaged as a part of a planned protest regarding of the death of George Floyd.

72. Twaddell accompanied May at the Library on Saturday, June 6, 2020.

73. The protest on June 6, 2020 was peaceful and there was no damage to the Library.

74. Hoffman reported to May after the protest that there had been no overt references to him or his FaceBook posts.

75. On Sunday, June 7, 2020, the May family attended church and, afterward, stopped by Hoffman's home.

76. May asked Hoffman whether he should attend an upcoming prayer rally (also related to George Floyd) and she initially indicated that he should and she would meet him there.

77. Later that afternoon, Hoffman sent a message to May indicating that she had changed her mind and was unwilling to stand beside him at the prayer rally.

78. In spite of Hoffman's rebuff, May and his wife, Sarah May, attended the prayer rally.

79. After the prayer rally, May and his wife conversed with some of the participants, including an African American woman who expressed strong approval of May's FaceBook posts—something that May found highly encouraging.

80. In the days that followed, local news media published several stories concerning May's FaceBook posts and the impending action of the Board of Trustees.

81. These news stories included quotes from the Board of Trustees, seeking to distance the Library from May's heavily mischaracterized statements.

82. In the midst of this publicity, the Board of Trustees called a special meeting for Tuesday, June 9, 2020, to address concerns related to May's FaceBook posts.

83. On the morning of June 9, 2020, May's wife noticed that he was showing signs of a mental health crisis, which she believed was related to stress arising out of the situation with May's FaceBook posts.

84. In response to her concerns, May's wife took him to the hospital, leading to his voluntary admission to inpatient mental health treatment.

85. Shortly after May's hospital admission, Sarah May reported to the Library that he would be unable to attend the special called meeting; May remained hospitalized until Tuesday, June 16, 2020.

86. The Board of Trustees proceeded with the special called meeting on June 9, 2020 in May's absence, with Hoffman, Thurman, Alexander and Jarrett in attendance from the start and Twaddell joining the meeting in progress.

87. After receiving public comments, the Board went into executive session to determine how to proceed with regard to May's future with the Library.

88. The decision that the Trustees made was to place May on paid administrative leave through the end of his contract on August 31, 2020.

89. The Board further determined that the Library would not renew his contract on September 1, 2020.

90. The decision made at the special meeting on June 9, 2020 was unanimously affirmed by the full board at its regular meeting on June 11, 2020.

91. The Trustees are the policy makers for the Library and were engaged in a policy-making function when they carried out adverse action against May with regard to his employment.

92. The decision to place May on administrative leave and to not renew his contract constitute adverse actions against him that were undertaken in retaliation for May's exercise of his constitutional right to free speech.

93. The 1st Amendment right to free speech is a clearly established right that each Trustee understood or should have understood at the time they were considering how to respond to May's FaceBook posts.

94. Government employees may not be required to relinquish their constitutional rights as a condition of maintaining their employment.

95. When May posted his comments regarding various issues of public interest, he was exercising his 1st Amendment right to free speech.

96. May's interest in expressing his religious and political views outweighs the Library's interest of avoiding the perceived impact of those views on operation of the Library.

97. The Trustee's investigation of the impact of May's FaceBook post on the Library was geared toward finding reasons to support their desire to get rid of him, rather than ascertaining the true impact of his statements.

98. The Board's action in seeking to alienate May from his co-workers by the manner in which they undertook to investigate the impact of his FaceBook posts is an adverse action that has resulted in the deprivation of his constitutional rights.

99. May's FaceBook posts did not result in any material disruption of the workplace or otherwise interfere with the mission of the Library.

100. The action of the Trustees in response to May's FaceBook posts would dissuade a person of ordinary firmness from exercising his or her constitutionally protected right of free speech.

101. Rather than capitulating to the false narrative of May's detractors, the Trustees had an obligation to respond to May's post in accordance with the message he was actually conveying.

102. By their actions, the Trustees allowed May's detractors to exercise a heckler's veto based on false and misleading characterizations of his views.

103. May is a victim of a troublingly common phenomenon known as "Cancel Culture," sometimes referred to as "Cultural Marxism."

104. The effect of Cancel Culture is to destroy the lives and livelihoods of those whose ideas conflict with the progressive orthodoxy of the moment.

105. In addressing the subject of May's FaceBook posts, the Trustees were faced with a choice between honoring May's 1st Amendment rights or capitulating to Cancel Culture.

106. Leadership sometimes requires courage, which in this case means that the Trustees should have stood by May instead of acceding to the demands of those who had distorted his statements.

107. Regrettably, the Trustees chose to "Cancel" May, in direct response to his efforts to engage in free expression concerning matters of utmost public interest.

108. Ultimately, it appears as though the Trustee's actions were based upon a speculative fear of negative public perception against the Library; speculative conclusions about public perception is never an adequate justification for restricting an employee's free speech rights.

109. The Trustees' adverse action with regard to May's employment with the Library was motivated by their desire to punish May for speaking out about controversial matters.

110. May's speech was precisely the sort of expression that the 1st Amendment is intended to protect.

111. But-for May's FaceBook post, his employment contract would have been renewed for 2020-21, just as it had been in years past.

112. The decision of the Board not to renew May's contract is based upon the unconstitutional motive of suppressing his 1st Amendment right to free expression.

113. As a direct consequence of the Trustees' unwillingness to take a stand in support of May's exercise of his 1st Amendment rights and against Cultural Marxism, May has suffered profound harm and resulting legal damages.

114. May has suffered profound reputational harm as a result of the Trustees' support of a false narrative about his views.

115. May has been diagnosed with a psychiatric condition triggered by stress from the Board of Trustee's mishandling of the public response to his FaceBook posts for which he has required ongoing psychiatric care.

## V. CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983
### VIOLATION OF FIRST AMENDMENT OF UNITED STATES CONSTITUTION

116. May incorporates by reference herein as fully as though set forth verbatim the allegations in the preceding numbered paragraphs and does further allege as follows.

117. The Library's and/or the Trustees' decision to terminate the Plaintiff's employment was retaliatory in nature and based, in whole or in part, on May's personal exercise of his protected free speech activity on matters of inherent public concern.

118. The Trustees' decision to place May on administrative leave and to not renew his contract constitutes viewpoint discrimination and impermissible governmental censorship of protected free speech activity.

119. The Trustees' actions, as set forth herein, served to deprive May of, and to infringe upon, his protected rights of freedom of expression as guaranteed by the First Amendment of the United States Constitution.

120. As a direct and proximate result of the Library's and/or Trustees' actions, May has suffered, and continues to suffer, economic and pecuniary damages in the form of expenses for psychiatric treatment and loss of earnings.

121. In addition, May has suffered mental anguish, humiliation, embarrassment and emotional injury for which he is entitled to an award of compensatory damages against the Library and/or the Trustees in their individual capacities.

## COUNT II
### EQUAL PROTECTION CLAUSE
### OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

122. May incorporates by reference herein as fully as though set forth verbatim the allegations in the preceding numbered paragraphs and does further allege as follows.

123. The Equal Protection Clause of the Fourteenth Amendment protects each person against intentional, arbitrary government discrimination, whether based on a policy's express terms or improper implementation by government agents.

124. The Supreme Court has recognized successful equal protection claims brought by a "class of one," in which a plaintiff alleges that the government has intentionally and without a rational basis treated him differently from others who are similarly situated.

125. The Trustees have selectively enforced the *de facto* policy of the Library as applied to May's conduct in this case.

126. The effect of the Trustee's practice, custom and policy is to erect a double standard which discriminates against May based on the content and viewpoint of his speech activity.

127. The Trustee's actions, as set forth herein, served to deprive May of, and to infringe upon, his protected rights of freedom of expression as guaranteed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

128. As a direct and proximate result of the Trustees' actions, May has suffered, and continues to suffer, economic and pecuniary damages in the form of expenses for psychiatric treatment and loss of earnings.

129. In addition, May has suffered mental anguish, humiliation, embarrassment and emotional injury for which he is entitled to an award of compensatory damages against the Library and/or the Trustees in their individual capacities.

### REQUEST FOR RELIEF

### DECLARATORY JUDGMENT

130. An actual controversy exists between the parties as to whether the Library's and or the Trustees' policies, practices and customs with regard to the restrictions placed its employee's free speech activity as expressed on the employee's personal social media are enforced in an arbitrary manner and therefore violate the employee's constitutional rights.

131. May respectfully requests a declaratory judgment that the actions of the Library and or the Trustees violated the federal and state constitutional rights of May.

## INJUNCTIVE RELIEF

132. May is entitled to injunctive relief in the form of an order directing the Library and/or the Trustees in their official capacity to rescind immediately his administrative suspension and permit him to return to his job.

133. May is further entitled to injunctive relief in the form of an order directing the Library to renew his employment contract inasmuch as its decision to not renew the contract is substantially based on an improper motive of punishing him for exercising his right to free speech.

134. May is also entitled to injunctive relief in the form of an order directing the Library and the Trustees to publish curative public statements that disavow the false narrative attached to May's FaceBook posts and to make a statement that truthfully and accurately characterizes his FaceBook posts.

## NOMINAL DAMAGES

135. May seeks an order awarding nominal damages for the Library's and/or the Trustees' violation of his federal and state constitutional rights.

## COMPENSATORY DAMAGES

136. May seeks an order awarding compensatory damages for the Library's and/or the Trustees' in their individual capacities violation of his federal and state constitutional rights in the amount of $2,000,000.00.

## ATTORNEY'S FEES AND COSTS

137. May seeks an order awarding the costs of this cause, including attorney's fees, costs and expenses under 42 U.S.C. § 1988.

## JURY DEMAND

138. May demands a jury of six to hear and try this case.

## OTHER RELIEF

139. May additionally requests such other relief as the Court deems just and proper.

Respectfully submitted,

/s Brian Schuette, Esq.
SCHUETTE LAW GROUP
719 Dishman Lane Ext.
Bowling Green, KY 42104
(270) 781-7500 Voice
(270) 781-7533 Facsimile
(270) 320-7500 Mobile
brian@slg.legal
*Counsel for the Plaintiff*

## **VERIFICATION**

I, Caleb H. May, hereby verify that the foregoing statements of fact are true and accurate to the best of my knowledge and belief.

_____
Caleb H. May

COMMONWEALTH OF KENTUCKY  )
                          )
COUNTY OF WARREN          )

Subscribed and sworn to before me by Caleb H. May on this the 10th day of July, 2020.

_____
Notary Public, State at Large
Notary ID#: 618326
My Commission Expires: 3-3-23

19