# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

| | | |
|---|---|---|
| **CALEB H. MAY,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| **HENDERSON COUNTY PUBLIC LIBRARY,** | ) | |
| | ) | |
| **JOAN HOFFMAN, Individually and in her Official Capacity as Trustee,** | ) | |
| | ) | |
| **SUSAN THURMAN, Individually and in her Official Capacity as Trustee,** | ) | **Case No. 4:20-cv-00108-JHM-HBB** |
| | ) | |
| | ) | **JURY DEMAND** |
| **STEVE TWEDDELL, Individually and in his Official Capacity as Trustee,** | ) | |
| | ) | |
| **BOBBIE JARRETT, Individually and in her Official Capacity as Trustee,** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **ARLENE ALEXANDER, Individually and in her Official Capacity as Trustee,** | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFF'S VERIFIED MOTION FOR PRELIMINARY INJUNCTION

When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored...We also note that reinstatement is an effective deterrent in preventing employer retaliation against employees who exercise their constitutional rights. If an employer's best efforts to remove an employee for unconstitutional reasons are presumptively unlikely to succeed, there is, of course, less incentive to use employment decisions to chill the exercise of constitutional rights.

*Squires v. Bonser*, 54 F.3d 168, 173 (3d Cir. 1995),
quoting *Allen v. Autauga County Board of Education,*
685 F.2d 1302, 1306 (11th Cir.1982).

Comes the Plaintiff, Caleb H. May, by counsel, and for his Verified Motion for Preliminary Injunction states as follows.

### INTRODUCTION

This a First Amendment retaliation action arising out of the wrongful suspension and planned non-renewal of Plaintiff Caleb May's employment contract as Director of the Henderson County Public Library. Acting through its Trustees, the Library took this adverse action against Plaintiff in response to religiously and politically motivated posts that he made as a private citizen on his private FaceBook page—free expression that is protected by the First Amendment to the United States Constitution. Because this ongoing violation of Plaintiff's constitutional rights is causing and will continue to cause irreparable harm, Plaintiff is entitled to a Preliminary Injunction requiring the Library to reinstate him to his position pending final resolution of the case.

### FACTUAL BACKGROUND[1]

Plaintiff Caleb H. May ("May") brought this action against the Henderson County Public Library ("Library") and its Trustees, each in their individual and official capacities, pursuant to 42 U.S.C. § 1983. May seeks legal damages, declaratory relief and injunctive relief. The particular injunctive relief that May seeks at this point is reinstatement to his position as Director of the Library, which would preserve the *status quo* pending final resolution of his claims.

May is thirty-eight years of age and resides in Henderson, Kentucky with wife, Sarah May, and their six children. He holds a bachelor's degree in Political Science from Washburn University and a Masters of Library Science from Emporia State University. May spent the first five (5) years of his career as Director of the Meade Public Library in Meade, Kansas. In 2015, May left that position to become Director of the Henderson County Public Library pursuant to the terms of a written employment agreement.

---

[1] The Verified Complaint filed by May sets forth the facts in detail. Only those facts that pertain to his request for injunctive relief are recited in this Motion.

The initial term of May's employment agreement was one (1) year, beginning on September 1, 2015 and ending on August 31, 2016. The contract is renewable for an unlimited number of subsequent one (1) year terms. May's contract with the Library was renewed in 2016, 2017, 2018 and 2019. Until the events giving rise to this civil action, May's performance as Director has been uniformly lauded by the Trustees, as evidenced by the multiple, successive renewals of his employment contract.

Things changed for May in late May/early June of 2020 when he made a handful of posts as a private citizen on his personal FaceBook account. These posts were made in the context of ongoing, seismic shifts in American culture, shifts that are evident in the aftermath of the death of an African American man in Minneapolis.

On May 25, 2020, in the midst of various national tensions, George Floyd, an African American man, was killed in Minneapolis by a police officer who knelt on his neck for nearly eight minutes, ignoring Floyd's statements that he could not breathe. Bystanders who witnessed the killing of George Floyd captured the event on video and released the footage on May 26, 2020.

The death of George Floyd sparked nationwide protests regarding racial injustice in the United States, in general, and the deaths of a number of African American men at the hands of law enforcement, in particular. While the protests began peacefully, they quickly escalated into riots, looting and violence. The various responses to the riots have served to deepen divisions in the United States, especially with regard to matters of racial injustice.

One organization that has played a prominent role in the protests is Black Lives Matter ("BLM"). BLM was formed in 2013 following the controversial acquittal of George Zimmerman in connection with the death of Trayvon Martin, an African American teenager. BLM's self-described

3

mission is "to eradicate white supremacy and build local power to intervene in violence inflicted on Black communities by the state and vigilantes."[2]

BLM further describes its beliefs, in part, as follows:[3]

"Struggling together," "imagining and creating a world free of anti-Blackness, where every Black person has the social, economic, and political power to thrive"; and

"We disrupt the Western-prescribed nuclear family structure requirement by supporting each other as extended families and "villages" that collectively care for one another, especially our children, to the degree that mothers, parents, and children are comfortable."

BLM also advocates for defunding the police, as illustrated by the following statement: "We know that police don't keep us safe — and as long as we continue to pump money into our corrupt criminal justice system at the expense of housing, health, and education investments — we will never be truly safe."[4]

One of the more controversial positions that BLM takes is that "white supremacy" is a widespread problem in the United States. It is within this cultural milieu that May chose to exercise one of the most coveted rights that a person in the United States possesses: the right to free speech.

The content of May's posts touched upon sensitive issues of significant public interest, including the issue of racial injustice. For example, in one post, May observed that from a Biblical perspective, there is only one race—the human race. May further observed that all people possess equal value in the eyes of God.

---

[2] https://blacklivesmatter.com/what-we-believe/
[3] Id.
[4] https://blacklivesmatter.com



Ordinarily, this would be an uncontroversial view that is so well-established that it can be traced back to the *Declaration of Independence*: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." In the present cultural milieu, however, this view of equality is met with staunch resistance from those whose political ideology is based on identity politics.

In another post, May criticized what he perceives to be the cynical manipulation of African Americans by the Democratic Party. This is a view that is widely held among political conservatives, of which May is one.

In addition to addressing the issue of race, May also spoke out about the political divide concerning Covid-19. In particular, he observed that many who advocate extreme social distancing were silent in the face of crowded protests following the death of George Floyd:



May then took aim at the logical and moral inconsistency between stating that "black lives matter" while tolerating high rates of abortion and other threats to the African American community:



May then posted the cartoon below to express his conviction that the notion of "white privilege" is itself grounded in racial animus and runs counter to the principle that people should be judged based upon "the content of their character, not the color of their skin":[5]



May made all of these posts on his personal FaceBook page. He did not in any way identify himself in the posts as being affiliated with the Library. May's purpose in making all of these posts was to express religious and political convictions as a private citizen, views that are commonly-held among many people of good conscience, including the idea that classifying people according to their skin color is divisive and contrary to Biblical truth.

May's posts address several matters of public interest: racial division, political division, protection of the unborn and public policy regarding the Covid-19.

On Wednesday, June 3, 2020, May learned that a number of individuals had misconstrued his posts and some were leveling against him the most serious allegation that can be made against a person—that he is a racist. The notion that May is a racist is belied by his strongly held Christian

---

[5] See https://www.americanrhetoric.com/speeches/mlkihaveadream.htm. This well-known phrase is from Dr. Martin Luther King's "I Have a Dream" speech, delivered on August 28, 1963, at the Lincoln Memorial, Washington D.C. The full quote is as follows: "I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."

convictions and his past involvement in political campaigns on behalf of prominent conservative African American politicians such as J.C. Watts and Dr. Alan Keyes.

Much to May's surprise, some of the individuals who had misconstrued his posts were responding by demanding that he be fired from his position as Director of the Library. On the afternoon of June 3, 2020, Joan Hoffman, President of the Board of Trustees of the Library, and Susan Thurman, also a Trustee, came to the Library to meet with May concerning the reaction to his FaceBook posts.

In their meeting, Hoffman indicated to May that the Trustees had received complaints from members of the Henderson community concerning his posts. Hoffman stated that she understood he was entitled to express his opinions, an apparent acknowledgment of his First Amendment right to free expression. Hoffman and Thurman also made clear to May that they were not asking him to remove his FaceBook posts, another apparent acknowledgment of his First Amendment right to free expression.

On Thursday, June 4, 2020, in response to the meeting with Hoffman and Thurman, May drafted a statement explaining the purpose of the posts and read it to each of the Trustees individually by telephone.[6] Later on the afternoon of June 4, 2020, May delivered the statement to Library staff explaining the purpose of the posts and urged any who were concerned to come and meet with him—consistent with his long-established open door policy.

On Friday, June 5, 2020, May went to the home of Hoffman to deliver a document unrelated to the FaceBook issue. May expected his visit with Hoffman to be brief, but it turned into an hour-long conversation. Even though May and Hoffman hold widely differing political views, they were able to converse in a civil and respectful manner. May left the conversation with

---

[6] A script of May's statement to Library employees is attached as Exhibit 2.

Hoffman feeling as though she understood his intentions and knew that he was not a racist, nor did he harbor racist views.

On the evening of Friday, June 5, 2020, Henderson City Manager Buzzy Newman contacted May and directed him to be at the Library on the following day to assure that it was not damaged as a part of a planned protest regarding of the death of George Floyd. Tweddell accompanied May to the Library on Saturday, June 6, 2020.

The protest on June 6, 2020 was peaceful and there was no damage to the Library. Hoffman reported to May after the protest that there had been no overt references to him or his FaceBook posts. On Sunday, June 7, 2020, the May family attended church and, afterward, stopped by Hoffman's home.

May asked Hoffman whether he should attend an upcoming prayer rally (also related to George Floyd). She initially indicated that he should and that she would meet him there. Later that afternoon, Hoffman sent a message to May indicating that she had changed her mind and was unwilling to stand beside him at the prayer rally.

In spite of Hoffman's rebuff, May and his wife, Sarah, attended the prayer rally. After the prayer rally, May and his wife conversed with some of the participants, including an African American woman who expressed strong approval of May's FaceBook posts—something that May found highly encouraging.

In the days that followed, local news media published several stories concerning May's FaceBook posts and the impending action of the Board of Trustees. These news stories included quotes from the Board of Trustees, seeking to distance the Library from May's heavily mischaracterized statements.

In the midst of this publicity, the Board of Trustees called a special meeting for Tuesday, June 9, 2020, to address concerns related to May's FaceBook posts. On the morning of June 9,

9

2020, May's wife noticed that he was showing signs of a mental health crisis, which she believed was related to stress arising out of the situation with May's FaceBook posts. In response to her concerns, May's wife took him to the hospital, leading to his voluntary admission to inpatient mental health treatment.

Shortly after May's hospital admission, Sarah May reported to the Library that he would be unable to attend the special called meeting. May remained hospitalized until Tuesday, June 16, 2020. The Board of Trustees proceeded with the special called meeting on June 9, 2020 in May's absence, with Hoffman, Thurman, Alexander and Jarrett in attendance from the start and Tweddell joining the meeting in progress.

After receiving public comments, the Board went into executive session to determine how to proceed with regard to May's future with the Library. The decision that the Trustees made was to place May on paid administrative leave through the end of his contract on August 31, 2020. The Board further determined that the Library would not renew his contract on September 1, 2020. There is no question that this adverse action was in response to May's Facebook posts.

The decision made at the special meeting on June 9, 2020 was unanimously affirmed by the full board at its regular meeting on June 11, 2020.

Subsequent to these meetings, May appealed the decision of the Trustees and requested a hearing. The Trustees granted May's request and held a hearing on July 9, 2020. After receiving public comments, the Trustees went into executive session and voted unanimously to affirm their prior decision. Their sole stated reason was that they had lost confidence in May's ability to serve as Director.

Since July 9, 2020, May has applied for more than thirty jobs. He has only been granted three interviews and has received no offers. After one of the three interviews, May was advised that

he was not being considered for the position because of the circumstances giving rise to this civil action.

May now seeks injunctive relief in the form of an order reinstating him to his position as Director of the Library, pending the outcome of this case.

<u>**LEGAL DISCUSSION**</u>

**Preliminary Injunctive Relief**

Federal Rule of Civil Procedure 65 permits a District Court to grant preliminary injunctive relief. In a recent case in the U.S. District Court for the Western District of Kentucky, the trial court articulated the standard for granting a preliminary injunction as follows:

> The granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court." *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977) (citations omitted). The Supreme Court and the Sixth Circuit have noted that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). When considering whether to grant or deny a preliminary injunction, a district court must consider and balance four factors:
>
> > (1) the plaintiff['s] likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest.
>
> *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006) (*quoting Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)). The four factors should be "balanced[,]" are "not prerequisites that must be satisfied[,]" and "are not meant to be rigid and unbending requirements." *In re Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citations omitted).
>
> > *Frost v. Univ. of Louisville*, 392 F. Supp. 3d 793, 801 (W.D. Ky. 2019), <u>appeal dismissed,</u> No. 19-5624, 2019 WL 9051185 (6th Cir. Dec. 19, 2019)

**First Amendment Protection of Free Speech for Public Employees**

The First Amendment protects the free speech rights of government employees. A recent Sixth Circuit case describes this protection as follows:

11

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Mayhew v. Town of Smyrna, Tenn.*,856 F.3d 456, 462 (6th Cir. 2017) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). While it has been "long 'settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression,'" *Connick v. Myers*, 461 U.S. 138, 142 (1983), such protections must be construed in balance with the efficient functioning of government services. *Mayhew*, 856 F.3d at 461-62. In other words, if you bring a claim against your employer under the First Amendment, you must convince the court that your interest in speaking openly on a matter of public concern outweighs the government's interest in having an efficient workplace. "Thus, an individual's First Amendment rights as a public employee are narrower than those of the citizenry at large." *Haddad v. Gregg*, 910 F.3d 237, 244 (6th Cir. 2018) (citing *Mayhew*, 856 F.3d at 461-62).

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017)
(quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).

It is well-settled law that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). When a government actor takes adverse action against an employee in response to conduct that is protected by the First Amendment, the employee has an actionable claim under 42 U.S.C. 1983. See *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); and *Perry v. Sindermann*, 408 U.S. 593 (1972).

## Elements of a First Amendment Retaliation Case Under 42 U.S.C. 1983

The Sixth Circuit has articulated the elements of a First Amendment retaliation claim under 42 U.S.C. 1983 as follows:

A public employee alleging First Amendment retaliation must satisfy three requirements. *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337–38 (6th Cir. 2010). **First**, the employee must speak on "matters of public concern." *Id.* at 337 (citing *Connick*, 461 U.S. at 143, 103 S.Ct. 1684). **Second**, the employee must speak as a private citizen and not as an employee pursuant to his official duties. *Id.* at 338 (citing *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). **Third**, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). (emphasis added)

*Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 462 (6th Cir. 2017)

With regard to the content of a public employee's speech, the United States Supreme Court

has stated:

> **The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern**. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964); see also *Bond v. Floyd*, 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966): "Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected." (emphasis added)

> *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)

## Infringement of Public Employee's Free Speech Rights Prohibited

"It is clearly established that a State may not discharge an employee on a basis that infringes

that employee's constitutionally protected interest in freedom of speech." *Perry v. Sindermann*, 408

U.S. 593, 597 (1972). Even if the public employee "could have been discharged for any reason or

for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for

exercising her constitutional right to freedom of expression." *Rankin v. McPherson*, 483 U.S. 378,

383–84 (1987) (citing *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977); *Perry v.*

*Sindermann*, 408 U.S., at 597–598).

> The term "adverse action" arose in the employment context and has traditionally referred to actions such as "discharge, demotions, refusal to fire, nonrenewal of contracts, and failure to promote." *Thaddeus–X,* 175 F.3d at 396. However, this Circuit has held that any action that would deter a person of ordinary firmness from exercising protected conduct will suffice, which may include harassment or publicizing facts damaging to a person's reputation. *Id.* at 397.

> *Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 724 (6th Cir. 2010)

13

The question of whether a public employer's adverse action amounts to the deprivation of an employee's protected rights is decided according to a three-factor analysis. To prevail, the employee must show:

> (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Mezibov v. Allen,* 411 F.3d 712, 717 (6th Cir.2005) (citing *Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999) (*en banc*)).

> *Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 723 (6th Cir. 2010).

## The Pickering Balancing Test

Once a discharged employee establishes that his or her speech relates to a matter of public concern, that he was speaking as a private citizen, and that the speech is not in connection with his or her role as a public employee, the next step is to employ the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563 (1968).

> To prevail in the Pickering balancing test, Plaintiff must show by a preponderance of the evidence that her "first amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech in order to promote the efficiency of the public services it performs through its employees." In striking this balance, the Court considers these factors: whether an employee's comments meaningfully interfere with the performance of her duties or operations of the public employer, undermine the mission of the employer, create disharmony among co-workers, or impair discipline by superiors. (internal citations omitted)

> *See Rankin*, 483 U.S. at 387.

> The determination whether a public employer has properly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest **2897 of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are *employers,* concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On

14

the other hand, "the threat of dismissal from public employment is ... a potent means of inhibiting speech." *Pickering, supra,* 391 U.S., at 574, 88 S.Ct., at 1737. **Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech**. (emphasis added)

*Rankin v. McPherson,* 483 U.S. 378, 384 (1987).

### The Equitable Remedy of Reinstatement

"Reinstatement is an equitable remedy available in unconstitutional discharge cases arising under 42 U.S.C. 1983. *Versarge v. Township of Clinton, New Jersey,* 984 F.2d 1359, 1368 (3d Cir.1993)." *Squires v. Bonser*, 54 F.3d 168, 171 (3d Cir. 1995).

> An unconstitutionally discharged employee does not have an absolute right to reinstatement. See, e.g., *Professional Association of College Educators v. El Paso County Community College District*, 730 F.2d 258, 268 (5th Cir.), cert. denied, 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984) (hereinafter "*PACE* "). However, "[u]nder the Mt. Healthy analysis, **once the plaintiff establishes that his discharge resulted from constitutionally impermissible motives, he is presumed to be entitled to reinstatement**." *Id.* Although we are not certain this presumption flows inescapably from the Mt. Healthy opinion, we are willing to accept the Fifth Circuit's above statement of the law under the facts of this case. (emphasis added)

*Banks v. Burkich*, 788 F.2d 1161, 1164 (6th Cir. 1986)

To prevail on a claim for injunctive relief, a public employee must show that his or her conduct was "constitutionally protected and that it was a substantial or motivating factor in Defendant's decision to fire him." *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, (1977). "His speech or association is protected if it addresses a matter of public concern and the employer has no overriding state interest in efficient public service that would be undermined by the speech or association. *Rankin v. McPherson,* 483 U.S. 378, 384 (1987); *Connick v. Myers,* 461 U.S. 138 (1983); and *Boals v. Gray,* 775 F.2d 686, 692 (6th Cir.1985)." *Rankin*, 483 U.S. at 388.

In order overcome an employee's claim for injunctive relief, the public employer must:

> [S]how that it has an overriding state interest in efficient public service that would be undermined by Plaintiff's [protected activity]. Ultimately, Defendant must show that Plaintiff's termination would have taken place absent the protected conduct. *Mt.*

*Healthy*, 429 U.S. at 287; *Meyers v. City of Cincinnati*, 934 F.2d 726, 729 (6th Cir.1991); *Ratliff v. Wellington Exempted Vil. Sch. Bd. of Ed.*, 820 F.2d 792, 795 (6th Cir.1987)."

> *Milliron v. Louisville & Jefferson Cty. Metro. Sewer Dist.*,
> 867 F. Supp. 559, 563–64 (W.D. Ky. 1994).

## The Irreparable Harm Requirement

An employee seeking a preliminary injunction must show that this relief is necessary to avoid irreparable injury.

> When a plaintiff demonstrates a likelihood of success on the merits of a constitutional deprivation claim, it follows that he or she will suffer irreparable injury absent injunctive relief. See *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *Miller v. Davis*, 123 F. Supp. 3d 924, 937 (E.D. Ky. 2015) ("[T]he denial of constitutional rights, enumerated or unenumerated, results in irreparable harm").

> *Frost v. University of Louisville*, 392 F. Supp. 3d 793, 808 (W.D. Ky. 2019),
> appeal dismissed, 19-5624, 2019 WL 9051185 (6th Cir. Dec. 19, 2019).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976).

## The Inadequacy of Money Damages

Where an employee's discharge is predicated on his or her constitutionally protected activity, mere money damages is an inadequate remedy:

> An award of monetary damages and reinstatement to his position after a trial on the merits is not an adequate remedy for a deprivation of First Amendment rights. The loss of First Amendment rights, even for minimal periods of time, constitutes irreparable injury sufficient to justify injunctive relief. *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir.1989).

> *Milliron v. Louisville & Jefferson Cty. Metro. Sewer Dist.*,
> 867 F. Supp. 559, 564 (W.D. Ky. 1994).

> This action arises under § 1983, whose "purpose ... is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158,

16

161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992). In 1871, in fashioning § 1983—as, in 1991, it was to do in revising (with a view to strengthening) Title VII—Congress authorized courts to deploy both legal and equitable remedies. Under Title VII, the statute's make-whole purpose "is shown by the very fact that Congress took care to arm the courts with full equitable powers." *Albemarle Paper,* 422 U.S. at 418, 95 S.Ct. at 2372. The same is true under § 1983: the make-whole goal "[does] not differ when the basis of the underlying right is the Constitution rather than a statute such as Title VII." *Gurmankin,* 626 F.2d at 1121.7 Because of this consonance of the underlying policy considerations, the framework of analysis governing reinstatement in Title VII actions also governs in § 1983 actions implicating First Amendment concerns; that is, a denial of reinstatement is unwarranted unless grounded in a rationale which is harmonious with the legislative goals of providing plaintiffs make-whole relief and deterring employers from unconstitutional conduct. *Cf. Gurmankin,* 626 F.2d at 1121 (section 1983 cases involving "discrimination in employment based on stereotyped notions of ability...require[ ] equitable remedies comparable to those deemed appropriate in Title VII employment discrimination cases").

*Squires v. Bonser,* 54 F.3d 168, 172 (3d Cir. 1995)

"Reinstatement advances the policy goals of make-whole relief and deterrence in a way

which money damages cannot." *Squires v. Bonser,* 54 F.3d 168, 172 (3d Cir. 1995).

When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored...We also note that reinstatement is an effective deterrent in preventing employer retaliation against employees who exercise their constitutional rights. If an employer's best efforts to remove an employee for unconstitutional reasons are presumptively unlikely to succeed, there is, of course, less incentive to use employment decisions to chill the exercise of constitutional rights.

*Squires v. Bonser*, 54 F.3d 168, 173 (3d Cir. 1995),
quoting *Allen v. Autauga County Board of Education,*
685 F.2d 1302, 1306 (11th Cir.1982).

If the employer is allowed to redress his violation of an employee's First Amendment rights through mere money damages, the message to other employees is that they may lose their jobs if they speak out against their employer or, as in the present case, campaign against incumbent Board members. **The prospect of money damages will not be sufficient for many employees to overcome the otherwise chilling effect that accompanies the threat of termination.** Moreover, employment, especially in a career such as education, is more than a way to make money; it is a profession with significant non-monetary rewards. For such professionals, money damages may be a hollow victory. *See Allen v. Autauga County Board of Education,* 685 F.2d 1302, 1306 (11th Cir.1982). (emphasis added)

17

*Banks v. Burkich*, 788 F.2d 1161, 1164 (6th Cir. 1986).

[W]here state law does conflict with the federal constitution, the federal courts nonetheless "have a duty to prescribe appropriate remedies." *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974). As the Fifth Circuit stated:

> The fact that the school board has already hired another to fill that vacancy obviously cannot prevent appropriate relief by a court of equity in vindication of the law and the Constitution.

*Lee v. Macon County Board of Education,* 453 F.2d 1104, 1112 (5th Cir.1971). If the rule were otherwise, an employer could easily avoid reinstatement by simply quickly hiring another individual to replace the unconstitutionally discharged or demoted plaintiff.

*Banks v. Burkich*, 788 F.2d 1161, 1165 (6th Cir. 1986).

Even if reinstatement would be upsetting some, it is nevertheless an appropriate remedy, as explained in *Banks v. Burkich*:

> [T]he fact that reinstatement might have "disturbing consequences," "revive old antagonisms," or "breed difficult working conditions" usually is not enough "to outweigh the important first amendment policies that reinstatement serves [absent] probable adverse consequences [that] weigh so heavily that they counsel the court against imposing this preferred remedy." *PACE*, supra, 730 F.2d at 269. As the Fifth Circuit stated elsewhere, "Enforcement of constitutional rights frequently has disturbing consequences. Relief is not restricted to that which will be pleasing and free of irritation." *Sterzing v. Fort Bend Independent School District*, 496 F.2d 92, 93 (5th Cir.1974) (per curiam) (reversing district court's refusal to order reinstatement as remedy for violation of First Amendment rights that was based on finding that to do so "would only revive antagonisms"). In our view, the self-serving statements by the defendant superintendent that he could no longer work with plaintiff, standing alone, are not enough to establish this as one of those "exceptional cases in which reinstatement is inappropriate." *Allen*, supra, 685 F.2d at 1306.

*Banks v. Burkich*, 788 F.2d 1161, 1165 (6th Cir. 1986)

<u>**ARGUMENT**</u>

## I.   MAY'S FACEBOOK POSTS ARE PROTECTED FREE EXPRESSION UNDER THE FIRST AMENDMENT.

The right to free speech is one of the most coveted rights that Americans enjoy. Public

employees may not be required to give up this right in order to keep their jobs. *Connick v. Myers*, 461

18

U.S. 138, 142 (1983). It is beyond contention in this case that May's FaceBook posts are protected free expression. Joan Hoffman, President of the Board of Trustees, explicitly acknowledged that May had the right to express his views. Further, when she and her fellow Trustee, Susan Thurman, met with May on June 3, 2020, she made a point of telling him that he was not being asked to remove his posts. In spite of Hoffman's recognition that May's FaceBook posts were constitutionally protected, the Library and its Trustees chose to infringe upon his constitutional rights. This is exactly the sort of adverse action that "would deter a person of ordinary firmness from continuing to engage in" free expression. *Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 723 (6th Cir. 2010).

**II.    MAY HAS AN ACTIONABLE 42 U.S.C. 1983 CLAIM AGAINST THE LIBRARY AND ITS TRUSTEES.**

The decision of the Library and the Trustees to punish May for exercising his right of free expression gives rise to an actionable claim under 42 U.S.C. 1983. See *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); and *Perry v. Sindermann*, 408 U.S. 593 (1972). May has provided compelling evidence that satisfies each of the elements of a First Amendment retaliation case.

First, May's posts expressing religious and political convictions related to the issue of racial injustice address matters of public concern. In fact, aside from the COVID-19 Pandemic, there is presently no greater matter of public concern than racial injustice. *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 462 (6th Cir. 2017)

Second, May's posts were made as a <u>private</u> citizen on his <u>private</u> FaceBook page. At no time did he identify himself as being affiliated with the Library. *Id.*

Third, May's right of free speech outweighs any interest that the Library and its Trustees might have in silencing him. *Id.*

If the First Amendment does not protect May's FaceBook posts, it is difficult to conceive of what it might protect. By placing May on administrative leave and announcing plans not to renew his contract, the Library and its Trustees have deprived May of "rights, privileges, or immunities guaranteed under federal law or the U.S. Constitution." 42. U.S.C. § 1983.

This is one of those instances in which "[v]igilance is necessary to ensure that [the Library and its Trustees] do not use authority over [May] to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of [May's] speech. *Rankin v. McPherson,* 483 U.S. 378, 384 (1987)

### III. MAY IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF IN THE FORM OF REINSTATEMENT.

"Reinstatement is an equitable remedy available in unconstitutional discharge cases arising under 42 U.S.C. 1983." *Squires v. Bonser,* 54 F.3d 168, 171 (3d Cir. 1995) (internal citation omitted). To permit the adverse action against May to stand—even temporarily—would perpetuate a serious injustice. Moreover, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373–74 (1976).

May has established all of the elements necessary to be entitled to preliminary injunctive relief in the form of reinstatement under Fed. R. Civ. Pro. 65.

First, May is likely to succeed on the merits of his §1983 claim because he was clearly engaged in free speech as a private citizen on a matter of public concern. In addition, his First Amendment rights outweigh any hypothetical interest that the Library and its Trustees might have in silencing him. This is especially true where his statements were grossly mischaracterized by a small handful of detractors.

Second, May is experiencing and will continue to experience irreparable harm if injunctive relief is not granted. This is clearly demonstrated in the lack of success he has experienced in seeking other employment. Obviously, May has suffered severe reputational harm that money

20

damages cannot remedy as effectively as reinstatement. As in the *Milliron* case, "[a]n award of monetary damages and reinstatement to his position after a trial on the merits is not an adequate remedy for a deprivation of First Amendment rights." *Milliron v. Louisville & Jefferson Cty. Metro. Sewer Dist.,* 867 F. Supp. 559, 564 (W.D. Ky. 1994) (citing *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir.1989)). This case illustrates that, "w]hen a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole." *Squires v. Bonser*, 54 F.3d 168, 173 (3d Cir. 1995), (quoting *Allen v. Autauga County Board of Education*, 685 F.2d 1302, 1306 (11th Cir.1982)). In addition, May derives substantial "psychological benefits of work [that] are intangible, yet they are real and cannot be ignored." *Id.* See, further, *Frost v. Univ. of Louisville*, 392 F. Supp. 3d 793, 801 (W.D. Ky. 2019).

Third, granting injunctive relief in this case would not cause demonstrable, *i.e.* anything more than hypothetical, harm to anyone else. In fact, it would in some ways merely preserve the *status quo.* The balance of equities favors May over the Library because he is the one who has suffered so profoundly—all because the Library and the Trustees chose to act against him according to a false narrative and in disregard of his constitutional rights.

Fourth and finally, the impact on the public interest of granting May reinstatement would be wholly beneficial because, "reinstatement is an effective deterrent in preventing employer retaliation against employees who exercise their constitutional rights." *Id.* "If an employer's best efforts to remove an employee for unconstitutional reasons are presumptively unlikely to succeed, there is, of course, less incentive to use employment decisions to chill the exercise of constitutional rights." *Id.*

## CONCLUSION

This case presents the Court with an opportunity to use its equitable powers to right a serious wrong. While there is no way to turn back the clock, reinstating May to his position as

21

Director of the Henderson County Public Library would begin to repair his reputation. It would also send an important message that First Amendment rights are to be taken seriously—even when doing so requires courage.

For the foregoing reasons, the Court should grant the requested relief.

Respectfully submitted,

/s Brian Schuette, Esq.
SCHUETTE LAW GROUP
719 Dishman Lane Ext.
Bowling Green, KY 42104
(270) 781-7500 Voice
(270) 781-7533 Facsimile
(270) 320-7500 Mobile
brian@slg.legal
*Counsel for the Plaintiff*

## VERIFICATION

I, Caleb H. May, hereby verify that the foregoing statements of fact are true and accurate to the best of my knowledge and belief.

_____
Caleb H. May

COMMONWEALTH OF KENTUCKY    )
                            )
COUNTY OF WARREN            )

Subscribed and sworn to before me by Caleb H. May on this the 19th day of August, 2020.

_____
Notary Public, State at Large
Notary ID#:__6/2790___
My Commission Expires:__11/26/2022__

22

## CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing was this 19th day of August, 2020 filed through the Court's e-filing system and served via Regular U.S. Mail upon the following:

Henderson County Public Library
101 S Main Street
Henderson, KY 42420

Joan Hoffman, President of the Board of Trustees
c/o Henderson County Public Library
101 S Main Street
Henderson, KY 42420

Susan Thurman, Secretary of the Board of Trustees
c/o Henderson County Public Library
101 S Main Street
Henderson, KY 42420

Steve Tweddell, Treasurer of the Board of Trustees
c/o Henderson County Public Library
101 S Main Street
Henderson, KY 42420

Bobbie Jarrett, Trustee
c/o Henderson County Public Library
101 S Main Street
Henderson, KY 42420

Arlene Alexander, Trustee
c/o Henderson County Public Library
101 S Main Street
Henderson, KY 42420

With a Courtesy Copy Via Electronic Mail to:

J. Christopher Hopgood
Dorsey, Gray, Norment & Hopgood
318 Second Street
Henderson, KY 42420
chopgood@dkgnlaw.com

/s Brian Schuette, Esq.