246134

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:20-CV-108-JHM

CALEB MAY                                                                              PLAINTIFF

v.

HENDERSON COUNTY PUBLIC LIBRARY; *et al.*                              DEFENDANTS

---

**RESPONSE TO PLAINTIFF'S VERIFIED MOTION
FOR PRELIMINARY INJUNCTION**

---

Come the Defendants, Henderson County Public Library, Joan Hoffman, Susan Thurman, Steve Twedell, Bobbie Jarrett, and Arlene Alexander (hereinafter collectively referred to as "Defendants"), by and through counsel, and for their response to Plaintiff's Verified Motion for Preliminary Injunction [DN 6], hereby state as follows:

## I.   INTRODUCTION

Plaintiff, Caleb May, alleges violations of his civil rights against the Henderson County Public Library and its trustees, Joan Hoffman, Susan Thurman, Steve Twedell, Bobbie Jarrett, and Arlene Alexander, individually and in their official capacities as trustees to the Henderson County Public Library and seeks compensation for nominal damages, compensatory damages, and attorney's fees. (Complaint, DN 1, ¶¶ 116-129). Plaintiff also requests a declaratory judgment and injunctive relief. (*Id.* at ¶¶ 130-134). Specifically, Plaintiff claims Defendants' decision to place him on administrative leave and not renew his employment agreement served to deprive and infringe upon his protected rights of freedom of expression as guaranteed by the First Amendment and deprived and infringed upon Plaintiff's rights of freedom of expression as guaranteed by the

Equal Protection Clause of the Fourteenth Amendment. (*Id.* at ¶¶ 116-129). For the reasons that follow, Plaintiff's motion for preliminary injunction must be denied.

## II.    STATEMENT OF FACTS

Plaintiff was hired by the Henderson County Library to serve as its Director under the terms of a written employment agreement that was entered into on July 29, 2015. (Complaint, DN 1, ¶ 21; *see also* Henderson County Public Library Employment Agreement [DN 1-2]). The initial term of Plaintiff's employment agreement was one (1) year, beginning on September 1, 2015 and ending on August 31, 2016, renewable for an unlimited number of subsequent one (1) year terms. (Complaint, DN 1, ¶ 22). Plaintiff's employment agreement with the Henderson County Library was renewed in 2016, 2017, 2018, and 2019. (*Id.* at ¶ 23). His current employment agreement ended on August 31, 2020. (*Id.* at ¶ 24). On June 11, 2020, Henderson County Public Library District Board of Trustees placed Plaintiff on administrative leave and voted not to renew his employment agreement. (Minutes of the Regular Board Meeting, June 11, 2020, attached hereto as "Exhibit A"). Plaintiff remained in a paid status until August 31, 2020.

Plaintiff alleges that Defendants took these actions against him because of various posts made by him on Facebook concerning Black Lives Matter, racial division, political division, abortion, and the Covid-19 Pandemic. (Complaint, DN 1, ¶¶ 47-50; 53-56; 92). After facing backlash from the community, Plaintiff removed the posts and issued a public apology. Prior to the removal, the posts were shared over 200 times. (*See* Zoom conference, attached hereto as "Exhibit B"). From June 5, 2020 to June 15, 2020, the Library received approximately 146 comments on its website. (*See* website comments, attached hereto as "Exhibit C"). An overwhelming majority of the comments called for Plaintiff's resignation or termination. (*Id.*). Local news stations and newspapers also published stories concerning the posts. (*See* news

articles, collectively attached hereto as "Exhibit D"). The Library's Facebook pages were also inundated with Facebook posts and messages expressing outrage over Plaintiff's Facebook posts and calling for Plaintiff's resignation. (See Facebook posts and messages, collectively attached hereto as "Exhibit E").

The posts were made during a period of social unrest following the death of George Floyd on May 25, 2020. As of May 31, 2020, protests occurred in at least 140 cities across the United States and the National Guard was activated in at least 21 states, including Kentucky.[1] Black Lives Matter protests occurred in Henderson on June 2, 2020,[2] and again on June 6th and 7th, when 200 to 300 protesters marched around Central Park and various buildings throughout Henderson.[3] Several protests also occurred in neighboring cities and counties.[4]

Plaintiff only draws this Court's attention to four Facebook posts made by him on May 31, 2020 (Complaint, DN 1, PageID ##: 7-9, ¶¶ 47-50) and ignores the fact that Defendants considered several instances wherein Plaintiff demonstrated racist, sexist, unprofessional, and unbecoming conduct prior the vote not to renew his employment agreement. Plaintiff's social media posts merely triggered a discussion with staff which revealed several events that caused Defendants to lose confidence in Plaintiff's ability to lead the Library and supervise employees. (See Letter from J. Christopher Hopgood, Esq. to Brian Schuette, Esq., dated June 23, 2020, attached hereto as "Exhibit F").

---

[1] The New York Times. Fiery Clashes Erupt Between Police and Protesters Over George Floyd Death. (2020, May 30). Retrieved September 02, 2020, from https://www.nytimes.com/2020/05/30/us/minneapolis-floyd-protests.html

[2] Kaufman, M. (2020, June 03). Protestors gather in Henderson. Retrieved September 02, 2020, from https://www.tristatehomepage.com/news/local-news/protestors-gather-in-henderson/

[3] Hancock, A. K. (2020, June 06). Hundreds of peaceful protesters march through Henderson. Retrieved September 02, 2020, from https://www.14news.com/2020/06/06/hundreds-peaceful-protesters-march-through-henderson/

[4] Langhorne, T. (2020, June 07). Live updates: Evansville protest crowd demonstrates peacefully at 'I CAN'T BREATHE' rally. Retrieved September 02, 2020, from https://www.courierpress.com/story/news/local/2020/06/06/live-updates-evansville-protests-police-brutality-henderson-george-floyd-death-saturday/3161751001/

On June 7, 2020, Joan Hoffman, then Chairman of the Board of Trustees, met with Library staff via Zoom to discuss the matter and Plaintiff's performance as Director. (*See* Exhibit B). During the Zoom meeting, library staff voiced several concerns about Plaintiff's actions at work. Many of the concerns voiced by the Library staff predate Plaintiff's May 31st Facebook posts. Library staff informed Hoffman that Plaintiff did not know how to use the Library catalog system, run the circulation desk, or perform jobs of Library employees. (*Id.* at 44:01-45:00; 45:29-46:00). Plaintiff also had issues updating the catalog system and the Library's collection of items. (*Id.*). When Library staff attended conferences, individuals not associated with the Library also voiced concern to Library staff about Plaintiff's abilities as the Director of the Library. (*Id.* at 41:34-41:53). This concern was shared by members of the Henderson community. (*Id.* at 40:52-41:31). One Library patron represented to Library staff that he believed Plaintiff refused to provide him service due to his race. (*Id.* at 49:00-50:08).

Moreover, the Library staff felt that Plaintiff could not perform as an effectual leader and was often indecisive. Examples of Plaintiff's poor leadership skills included showing favoritism to certain employees, not having control over certain employees' actions, not listening to employees' concerns, miscommunication, and dishonesty. (*Id.* at 45:00-47:00). During employee evaluations, Plaintiff discussed his views on current political affairs and the COVID-19 pandemic. Plaintiff was also critical of employees outside of their presence and he often pitted employees against each other. (*Id.* at 1:06:54-1:09:00).

In addition, Plaintiff brought his children to the Library and expected Library staff to babysit them. (*Id.* at 1:16:18-1:23:00). Plaintiff's wife would often drop off and pick up the children. (*Id.*). On one occasion, Plaintiff and his spouse left the Library for the day without realizing that they had forgotten one of their children at the Library. (*Id.*). Library staff also

4

reported to Hoffman that Plaintiff allowed his spouse to use his key fob to gain access to the Library through the staff-only entrance. (*Id.*). Plaintiff's spouse would come to the Library, monitor the staff, and then recommend to Plaintiff that he discipline them for failing to perform their job duties. (*Id.*). On multiple occasions, Plaintiff disciplined Library staff at the request of his spouse. (*Id.*). Plaintiff's spouse would also interrupt Library meetings. (*Id.*).

Worse, Defendants learned that Plaintiff had discussed inappropriate sexual matters with Library staff and patrons. On one occasion, Plaintiff discussed a groin issue with a female employee. (*Id.* at 51:00-53:30). She perceived this discussion to concern Plaintiff's penis. (*Id.*). Against the desire of Library staff, Plaintiff also recited love poems to female Library employees while they performed their duties and responsibilities. (*Id.* at 1:02:30-1:03:00). Plaintiff commented on the apparel and outward appearance of Library staff. He also made an unwanted remark about a female employee's long legs. Additionally, a sculpture of two great horned owls is placed outside of the Library. When Plaintiff was asked by a patron where the statues were [they were temporarily removed for maintenance], Plaintiff repeatedly replied "you mean the horny hooters -we call them the horny hooters." (*Id.* at 1:10:00-1:11:00).

Prior to the May 31, 2020 Facebook posts, Plaintiff also demonstrated conduct during the course and scope of his employment as the Director that could be, and was, perceived as racist conduct. For instance, the NAACP regularly used the Library as a meeting place. Prior to one meeting, Plaintiff approached Carla Bradley, Circulation Manager for the Library and an African American, and asked her "What do y'all like to be called: Black, Negros, or African American." (*Id.* at 47:19-49:02). On another occasion, Plaintiff went to a different African American employee's office and, without provocation, started a conversation by stating, "Well, unfortunately

my family owned slaves." (*Id.* at 50:25-51:16). Perhaps one of the most shocking and outrageous racist comments made by Plaintiff was when he recited the following "joke" while at work:

> A man shows up to a farm and a farmer comes out. The man points to a woman in the yard and he says to the Farmer "Oh, is that your little nagger."
>
> And the Farmer replies, "No, that's my wife. The nagger is in the kitchen."

(*Id.* at 37:55-39:12).

During the Zoom meeting, Library staff stated that they did not want to be in the building with Plaintiff. (*Id.* at 1:03:00-2:03:012). The Library staff were adamant that they would not be able to continue to work with him. (*Id.*). Despite the workplace tension, Plaintiff approached an African American employee to discuss his Facebook posts. (*Id.* at 1:03:30-1:05:30). The employee indicated to Plaintiff that she did not wish to discuss the Facebook posts and would prefer to continue to work; however, Plaintiff interfered with her ability to perform her job duties and continued to discuss his Facebook posts. (*Id.*).

Although Plaintiff apologized for his conduct, Library staff felt his apology was insincere. To make matters worse, during an evaluation of an employee supervised by Ms. Bradley, Plaintiff turned to Ms. Bradley and randomly stated to her and the employee that Henderson County's "old money" came from families who farmed cash crops with slaves. (*Id.* at 1:23:22-1:25:00). Such comment was made after Plaintiff made the May 31st Facebook posts and while workplace tension was high due to said posts. (*Id.*). Both Ms. Bradley and the employee were offended by the comment. (*Id.*).

Plaintiff's Facebook posts also caused Library staff concern for their individual safety. Library staff stated that the general public associated Plaintiff's personal Facebook posts with the Library and its employees. (*Id.* at 1:25:00-1:30:00). Such an association had a negative impact on the Library employees. (*Id.*). One employee did not go out in public following Plaintiff's

6

Facebook posts due to retribution she faced for such comments while shopping. (*Id.*). Library staff also feared that Plaintiff's Facebook posts would cause protest around the Library's campus. (*Id.*).

Many members of the Henderson Community shared the Library staff's concerns. (*Id.* at 1:11:00-1:13:00). During the Zoom meeting, Library staff also represented that donors were threatening to withdraw monetary support due to Plaintiff's Facebook post and that they observed patron use and volume decrease following Plaintiff's Facebook post. (*Id.*; *see also* text message from Brenna Caudill, attached hereto as "Exhibit G"). Plaintiff's Facebook posts also hurt interactions with other communities and damaged the Library's outreach initiatives.

On June 9, 2020, the Library Trustees held a Special Board Meeting to discuss the Facebook posts and concerns voiced by the Library staff. Subsequently, the Library Trustees held a Regular Board Meeting on June 11, 2020. At this meeting, the Trustees entered 138 emails to the general Library account as public comment. The Library Trustees also read Facebook comments from the Zoom meeting into public comment. Fifteen individuals, including Rev. Charles Johnson on behalf of the Human Rights Commission and Deborah Hoda on behalf of the NAACP, also presented public comment. Following public comment, the Library Trustees went into executive session to consider Plaintiff's employment. The Library Trustees voted not to renew Plaintiff's employment agreement and placed Plaintiff on paid administrative leave through the end of the contract term.

Specifically, examples of Plaintiff's conduct that led to Defendants' decision were as follows:

- Plaintiff told this joke in the presence of a female employee: [stranger to farmer where a female was working in the yard] "Is that your little nagger?" Farmer: "No, that's my wife, the nagger is in the kitchen."

7

- Additionally, Henderson's downtown area has sculptures of birds taken from John James Audubon paintings. When Plaintiff was asked by a patron where the statues were [they were temporarily removed for maintenance], Plaintiff repeatedly replied "you mean the horny hooters -we call them the horny hooters." The sculpture is of two great horned owls.

- A female patron came to the library in the summer and Plaintiff commented in front of female employees about her revealing clothes and physique.

- A different female patron brought her child to story hour. She stepped away to a quiet, private area to breast feed her infant. Plaintiff followed her, engaged in conversation with her, stared at her and made her feel uncomfortable.

- An African American female employee wanted to have the annual black history month event in an area in Henderson where many African Americans reside. Plaintiff delayed the decision on the location until it was too late, and the event had to be conducted at the traditional location: the Presbyterian Church across the street from the Library.

- The female employees stated that if you're white, male and protestant, your ideas are good. If not, your ideas are not good.

(Letter Exhibit F; Affidavit of Joan Hoffman, attached hereto as "Exhibit H"; Affidavit of Susan Thurman, attached hereto as "Exhibit I"; Affidavit of Steve Tweddell, attached hereto as "Exhibit J"; Affidavit of Bobbie Jarrett, attached hereto as "Exhibit K"; Affidavit of Arlene Alexander, attached hereto as "Exhibit L").

## III.    RESPONSE TO PLAINTIFF'S ARGUMENT

A preliminary injunction is an "extraordinary remedy." *Overstreet v. Lexington- Fayette Urban Cty. Govt.*, 305 F.3d 566, 573 (6th Cir. 2002). The Court may only grant the injunction if Plaintiff proves that his circumstances "clearly demand it." *Id.* To decide if they do, federal courts consider four factors: (1) whether Plaintiff is likely to succeed on the merits, (2) whether Plaintiff will suffer irreparable injury without an injunction, (3) whether the injunction will substantially harm others, and (4) whether the injunction serves the public interest. *Id.* As applied to the instant action, all four factors weigh against Plaintiff and in favor of Defendants.

As for Plaintiff's burden with respect to these four factors,

[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion, for example, and we therefore express no opinion as to the ultimate merits of the plaintiffs' case. *See generally Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 818–19 (4th Cir.1991) (observing that the standard for obtaining a preliminary injunction is higher than the standard for surviving summary judgment); *William G. Wilcox, D.O., P.C. Employees' Defined Benefit Pension Trust v. United States*, 888 F.2d 1111, 1114 (6th Cir.1989) (noting that "a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is not dispositive of those substantive issues on the merits"); *National Wildlife Fed'n v. Burford*, 878 F.2d 422, 432 (D.C.Cir.1989) ("To obtain a preliminary injunction, [the plaintiff] not only had to demonstrate specific harm, but also carry the *burden of persuasion*, showing a likelihood of success on the merits. On a motion for summary judgment, a plaintiff need only create a jury issue."), *rev'd on other grounds sub nom. Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). This is because the preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel*, 952 F.2d at 811 (quotation omitted) (alteration in original); *see also Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir.1978).

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Plaintiff cannot meet this stringent burden.

### A. Plaintiff's motion must be denied because he is unlikely to succeed on the underlying merits of his claims.

Plaintiff is not likely to succeed on the merits of his First Amendment claim nor his Fourteenth Amendment (Equal Protection Clause) claim. Plaintiff's equal protection claim is what has been described as a "class-of-one" claim of denial of equal protection. (Complaint, DN 1, PageID #: 17, ¶ 124). The essence of such claim is that the Plaintiff was intentionally and maliciously treated differently than others similarly situated and the absence of any allegation that the reason for such treatment was the plaintiff's membership in a protected class. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In *Engquist v. Oregon Department of Agriculture*, the United States Supreme Court squarely rejected such a cause of action insofar as public employees are concerned. In the words of the Court:

9

> The question in this case is whether a public employee can state a claim under the Equal Protection Clause by alleging that she was arbitrarily treated differently from other similarly situated employees, with no assertion that the different treatment was based on the employee's membership in any particular class. We hold that such a "class-of-one" theory of equal protection has no place in the public employment context.

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603-04 (2008). Likewise, courts within the Sixth Circuit hold that the class-of-one theory of liability "has no application in the public employment context." *Courser v. Michigan House of Representatives*, 404 F.Supp.3d 1125, 1147-48 (W.D. Mich. 2019) (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603-04 (2008)); *Condiff v. Hart County School Dist.*, 770 F.Supp.2d 876, 890 (W.D. Ky. 2011). There is no dispute that Plaintiff was a public employee. Accordingly, Defendants will be entitled to a dismissal of Plaintiff's Fourteenth Amendment claim, and this factor weighs heavily in favor of denying Plaintiff's motion for a preliminary injunction.

Similarly, Plaintiff's First Amendment claim fails as a matter of law. To establish the prima facie elements of a First Amendment retaliation claim, a public employee must show that: "(1) she engaged in constitutionally protected speech; (2) she was subjected to adverse action or was deprived of some benefit, and (3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir.2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If the plaintiff satisfies these requirements, "the burden of persuasion shifts to the defendant who must show by a preponderance of the evidence that there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity at issue." *Leary v. Daeschner*, 349 F.3d 888, 898 (6th Cir.2003). Plaintiff will not be able to establish that he engaged in constitutionally protected speech or that the alleged protected speech was a "substantial" or "motivating factor" in his termination.

10

Although "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004), it is clear that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Indeed, a public employer may "impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Roe*, 543 U.S. at 80. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418. Whether a public-employee plaintiff engages in constitutionally-protected speech depends on whether he is speaking as a citizen on a matter of public concern, and whether his interest in so speaking outweighs the State's interest in promoting effective and efficient public service. *Pickering v. Bd. of Educ. of Township High School Dist.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); *Fitzpatrick v. City of Frankfort*, 305 Fed.Appx. 258, 262 (6th Cir. 2008). Both requirements are questions of law. *Fitzpatrick*, 305 Fed.Appx. at 262. Plaintiff's speech fails to satisfy either.

Plaintiff's Facebook posts do not address matters of public concern. In *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888 (6th Cir.2003), the Sixth Circuit described speech on matters of public concern as

> speech relating to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).... "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. In general, speech involves matters of public concern when it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg [v. Housing Authority of Irvine]*, 253 F.3d [891] at 898 [(2001)] (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983)).

11

*Banks*, 330 F.3d at 893. Moreover, "the speech must not merely relate generally to a subject matter that is of public interest, but *must sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government.*" (*Pacheco v. Waldrop*, No. 5:13-CV-00044-TBR, 2013 WL 2581016, *8 (W.D. Ky. June 11, 2013)) (internal quotes and citation omitted) (emphasis added); *see also Roe*, 543 U.S. at 526 (holding police officer's speech not a matter of public concern because it "did nothing to inform the public about any aspect of the [police department's] functioning or operation."); *Hernandez v. City of Phoenix*, 432 F.Supp.3d 1049, 1061 (D. Ariz. 2000). In evaluating the speech of a public employee, federal courts may look to the employee's duties, "the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007).

Plaintiff's speech does not touch upon matters of public concern because his Facebook posts are not helpful to the public in evaluating the conduct of the government. Rather, Plaintiff criticizes the Black Lives Matter movement and the "looney left" when he states that Black Lives Matter protestors "aren't truly worried about COVID-19." (Complaint, DN 1, ¶ 48). Plaintiff also expresses his personal belief that race is not biblical, the term "white privilege" is racist, and Black Lives Matter is hypocritical. (Complaint, DN 1, ¶¶ 47-50). The posts do not address how the government is responding to Black Lives Matter nor COVID-19, much less any government conduct. Accordingly, Plaintiff's Facebook posts were not constitutionally-protected speech, and his motion for a preliminary injunction must be denied.

However, even if Plaintiff could demonstrate that he was speaking as a private citizen about a matter of public concern (which is denied), Defendants' interest in promoting the efficiency of the public services performed by the Library outweighs any *potential* First Amendment interest. In applying the *Pickering* balancing test, the Sixth Circuit outlines several factors relevant to this

12

analysis, including whether the speech was likely to foment controversy and disruption, impede the Library's general performance and operation, and affect the loyalty and confidence necessary to the Library's proper function. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007) (discussing *Soloman v. Royal Oak Twp.*, 842 F.2d 862, 865 (6th Cir. 1988); *Pickering*, 391 U.S. at 569-70). Courts also examine whether the conduct would "meaningfully interfere with the performance of [his] duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir.1994). In weighing the competing interests, courts have "given substantial weight to government employers' reasonable predictions of disruption." *Waters v. Churchill*, 511 U.S. 661, 673 (1994); *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 54-55 (6th Cir. 2001); *Baar v. Jefferson County Bd. of Educ.*, 686 F.Supp.2d 699, 711-12 (W.D. Ky. 2010). Even though an employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," *Connick*, 461 U.S. at 152; *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir, 2017), Defendants did just that. The decision not to renew Plaintiff's employment agreement was made after it was clear that there was a disruption of the office and a destruction of working relationships.

There can be no question that Plaintiff's speech undermined legitimate goals of the Library and directly contradicted and frustrated the Library's core purposes. The Library was established as a taxing district under KRS 173.710 with a mission to "provide access to information and opportunities to pursue lifelong learning, economic and cultural enrichment, and recreational enjoyment." (Henderson County Public Library Strategic Plan 2015-2020: Library Mission and Vision Statement, pg. 6, attached hereto as "Exhibit M"). The Vision Statement of the Library

13

states that it "will connect the *entire community* with resources, services, and ideas!" (*Id.*) (emphasis added). In 2015, the Library adopted a strategic plan to further its mission and vision statements. (*Id.*). Among other focuses, the strategic plan addressed the Library's desire to increase community outreach by placing the most emphasis on goals that had the greatest community focus. (*Id.* at pg. 3). Plaintiff's Facebook posts negatively impacted the mission and goals of the Library by alienating many groups within the community, including but not limited to, Black Lives Matter supporters, NAACP members/supporters, Humans Rights Commission members/supporters, and Democrats. The negative impact to the Library's community outreach mission is illustrated by the following comments posted on the Library's website:

> This statement is racist, inflammatory, and unbefitting of a public library director. Public libraries serve all people.
>
> Mr. May's words show that he does not actually embody HCPL's mission statement or vision statement.
>
> I demand the removal of your library director for racist ideologies being posted on Facebook. This does not promote the library as a safe space.
>
> Libraries are supposed to be a place of peace for EVERYONE and you can't foster such an environment when the executive director is a racist. Remove him and weed out other bigots. Otherwise you're turning your back on the mission of public libraries.
>
> The recent post by Caleb May on his personal account reflects exactly the opposite of the central values and tenets of our field. It is unacceptable that a librarian would present such views ever, let alone at a time when our Black communities need us more than ever.
>
> The comments made on your library director's personal Facebook page about the BLM movement are shameful to our profession. They do not uphold the ethics and principles stated by ALA and they pose a threat to equality in your community. In order to provide equal access, libraries must be on the forefront of helping those in need, whose communities are hurting. Given the highly sensitive subject matter, I would hope that someone in a position of power would either keep these divisive opinions to themselves or choose to support matters of great importance to the community. I am severely disappointed. These comments threaten the reputation of one of the most trusted institutions in America. I hope that your board will choose to take action.

> Please hold your director accountable for his racist statements. Librarians should be held to a high standard, as their role is to provide a public service to all patrons regardless of race (or creed, sexuality etc). These statements not only alienate your black patrons but show that your library is not a place for a free and open exchange of ideas.
>
> I can't help but notice, upon perusing your website, that your vision is to "connect the entire community with resources, services, and ideas!" I'm writing to tell you that you cannot possibly do that with a director who makes statements like the one above, even on a personal profile.
>
> The public comments stated by your executive director, Caleb May, on his Facebook page are racist, unacceptable, and deeply offensive to black patrons you serve.

(Exhibit C). These comments are merely a limited sampling of the majority of comments calling for Plaintiff's termination. The website comments unquestionably demonstrate the negative impact Plaintiff's comments had on the Library's goals and missions. *See Rankin v. McPherson*, 483 U.S. 378, 389 (1987) (suggesting that speech "discredit[ing]" a public employer would tend to justify remedial measures). This factor clearly weighs in favor of Defendants.

Likewise, Plaintiff cannot seriously argue that his speech was not likely to foment controversy and disruption. Plaintiff's attempt to belittle the social unrest following the death of George Floyd had the intent to do exactly that. *See, e.g., Venable v. Metropolitan Government of Nashville*, 430 F.Supp.3d 350, 360-61 (M.D. Tenn. 2019) (holding First Amendment did not protect public employee's comments "made directly in response to a police shooting at a time when police shootings were a hot topic of debate among members of the public and subject of nationwide protests"). The Henderson County area was also impacted by the social unrest, as evidenced by the multiple rallies, the deployment of the National Guard in Kentucky, and the deployment of the National Guard in Evansville, Indiana – a short drive from Henderson, Kentucky.[5] As Plaintiff's Facebook posts concerned Black Lives Matter protests over Mr. Floyd's

---

[5] Kaufman, *supra* note 2; Hancock, *supra* note 3; Langhorne *supra* note 4.

15

death, the posts cannot be divorced from the social unrest, controversy, and disruption associated with same. This factor clearly weighs in favor of Defendants' decision to not renew Plaintiff's contract.

Plaintiff's Facebook posts also impeded the Library's general performance and operation and created disharmony among co-workers. Following Plaintiff's Facebook posts, the Library was inundated with phone calls, emails, Facebook posts, and comments calling for Plaintiff's termination. The large volume of complaints interfered with Library employees' ability to perform their job duties and responsibilities. Moreover, during the Zoom meeting, Library staff stated that they did not want to even be in the building with Plaintiff. The Library staff were adamant that they would not be able to continue to work with Plaintiff. Plaintiff's Facebook posts also caused Library staff concern for their individual safety. Library staff stated that patrons of the Library and the general public associate Plaintiff's Facebook posts with the Library and its employees. Such an association had a negative impact on the Library employees. One employee did not go out in public following Plaintiff's Facebook posts due to her fear of retribution. As such, this factor weighs in favor of Defendants.

In balancing the interest, Defendants' interest in promoting the efficiency of the services provided by Henderson County Library outweighs Plaintiff's First Amendment right to comment publicly on his concerns. Plaintiff is unlikely to succeed on the merits of his claims for this reason alone. Consequently, his motion for preliminary injunction must be denied.

Notwithstanding that Plaintiff's Facebook posts were not constitutionally protected speech, Henderson County Trustees decided not to renew Plaintiff's employment agreement due to Plaintiff's conduct and actions unrelated to the Facebook posts. Examples of Plaintiff's conduct which led to his termination were as follows:

16

- Plaintiff told this joke in the presence of a female employee: [stranger to farmer where a female was working in the yard] "Is that your little nagger?" Farmer: "No, that's my wife, the nagger is in the kitchen."

- Additionally, Henderson's downtown area has sculptures of birds taken from John James Audubon paintings. When Plaintiff was asked by a patron where the statues were [they were temporarily removed for maintenance], Plaintiff repeatedly replied "you mean the horny hooters -we call them the horny hooters." The sculpture is of two great horned owls.

- A female patron came to the library in the summer and Plaintiff commented in front of female employees about her revealing clothes and physique.

- A different female patron brought her child to story hour. She stepped away to a quiet, private area to breast feed her infant. Plaintiff followed her, engaged in conversation with her, stared at her and made her feel uncomfortable.

- An African American female employee wanted to have the annual black history month event in an area in Henderson where many African Americans reside. Plaintiff delayed the decision on the location until it was too late, and the event had to be conducted at the traditional location: the Presbyterian Church across the street from the Library.

- The female employees stated that if you're white, male and protestant, your ideas are good. If not, your ideas are not good.

(Exhibit F; Exhibit H; Exhibit I; Exhibit J; Exhibit K; Exhibit L). Library staff informed Defendants that Plaintiff did not know how to use the Library catalog system, run the circulation desk, or perform jobs of Library employees. (Exhibit B at 44:01-45:00; 45:29-46:00). Moreover, the Library staff felt that Plaintiff could not perform as an effectual leader and was often indecisive. (*Id.* at 45:00-47:00). Based on this information, Defendants voted not to renew his employment agreement. As such, Plaintiff was not terminated for his Facebook posts, but rather due to Defendants' loss in confidence in Plaintiff's ability to lead the library and supervise employees. Accordingly, he is not likely to succeed on the merits of his First Amendment claim so his motion for a preliminary injunction must be denied.

17

**B. Plaintiff's motion must be denied because he has not, nor can he, demonstrate that he will suffer an irreparable injury without an injunction.**

The injunction seeker "must always demonstrate some irreparable injury" before the Court can consider granting him the remedy he seeks. *Friendship Materials, Inc. v. Mich. Brick, Inc.,* 679 F.2d 100, 104 (6th Cir. 1982). Regardless of the other factors, the Court must deny Plaintiff's motion unless he can show some irreparable injury. *See S. Milk Sales, Inc. v. Martin,* 924 F.2d 98, 103 (6th Cir. 1991) (affirming the denial of a preliminary injunction absent an irreparable injury). And to show irreparable injury, Plaintiff must be facing a harm so irreversible that "no adequate remedy at law" exists. *Gilley v. United States,* 649 F.2d 449, 454 (6th Cir. 1981). "Put differently, [Plaintiff] must show a judgment would come too late to prevent or to heal the injury he alleges." *Conn v. Deskins,* 199 F.Supp.3d 1172, 1174 (E.D. Ky. 2016). Plaintiff has not met, nor can he meet, this burden. Consequently, Plaintiff's motion must be denied.

The alleged injuries cited in Plaintiff's motion for a preliminary injunction do not constitute irreparable harm. Lost wages, damaged reputation, and difficulty finding employment are not irreparable injuries. *See Sampson v. Murray,* 415 U.S. 61, 91-92 (1974). Indeed, in *Sampson,* the Supreme Court held that such damages incurred by a governmental employee were not the "type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction ...." *Id.; see also Overstreet,* 305 F.3d at 578-79 ("The Court concludes that [the injunction seeker] will not suffer irreparable harm by virtue of the fact that he may lose his job while litigation is pending.") In support of his motion, Plaintiff contends that he has experienced, and will continue to experience, damage to his reputation and difficulty in seeking other employment. Because Plaintiff will not suffer an irreparable injury if his motion be denied, he is not entitled to a preliminary injunction and the Court must deny Plaintiff's motion.

18

Citing *Banks v. Burkich*, 788 F.2d 1161, 1165 (6th Cir. 1986), Plaintiff erroneously contends that monetary damages are an inadequate remedy following an employee's discharge. "In *extraordinary* cases, not being in the job you are entitled to can cause an irreparable injury." *Conn v. Deskins*, 199 F.Supp.3d at 1174 (emphasis added). Such cases exist when plaintiffs have shown that "substantially delayed promotions" would interfere with job advancement. *Id.* But unlike in *Banks*, Plaintiff's injury can be remedied at the end of this lawsuit. The specific pain he alleges – damage to his reputation and difficulty in seeking other employment – are calculable damages that can be cured, should he be successful, with back pay, consequential damages, eventual reinstatement, etc. *See, e.g., Overstreet*, 305 F.3d at 579 (noting that the loss of income after termination is recoverable in damages); *Conn*, 199 F.Supp.3d at 1174. Plaintiff alleges nothing extraordinary or uniquely irreparable about his unemployment situation. *See Sampson*, 415 U.S. at 91-92 (holding that ordinary wrongful termination injuries of lost wages, damaged reputation, and difficulty finding employment are not irreparable injuries). His alleged injury thus falls "far short" of the irreparable injury standard. *Id.* at 91. Consequently, Plaintiff's motion for preliminary injunction must be denied.

Likewise, Plaintiff's alleged constitutional deprivation does not constitute irreparable injury. Past alleged constitutional violations are insufficient to show irreparable injury warranting a preliminary injunction. *See Conn*, 199 F.Supp.3d at 1174-75; *see also Johnson v. Morales*, 17-CV-12405, 2017 WL 6512450, at *5, fn. 2 (E.D. Mich. Dec. 20, 2017), *aff'd in part, rev'd in part and remanded*, 946 F.3d 911 (6th Cir. 2020) (collecting cases). Indeed,

> [Plaintiff] is right that losing a constitutional right—however briefly—is sometimes an irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (First Amendment rights); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984) (Eight Amendment rights); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir.1984) (privacy rights). Those cases, however, have something important in common: the plaintiffs were all seeking a preliminary injunction

to *prevent* a constitutional injury. *See Elrod*, 427 U.S. at 373, 96 S.Ct. 2673 (preventing restraints on freedom of association); *Mitchell*, 748 F.2d at 806 (preventing overcrowding in prisons); *McDonell*, 746 F.2d at 787 (prohibiting the enforcement of a policy allowing car searches, strip searches, urinalyses, and blood tests).

This is not one of those cases. [Plaintiff] does not allege an imminent or ongoing constitutional violation. If his due process rights were violated, it was in the past. *Cf. Bob Jones Univ. v. Simon*, 416 U.S. 725, 750, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974) (recognizing that even the impending imposition of allegedly inadequate process is not an imminent irreparable injury). And if [Plaintiff] succeeds in this suit, the remedies that courts can prescribe litigants like him— damages and reinstatement—will adequately address his past injuries. Thus, [Plaintiff] has no injury, constitutional or otherwise, that entitles him to immediate relief.

*Conn*, 199 F.Supp.3d at 1174-75 (emphasis original). Similar to the plaintiff in *Conn*, Plaintiff's injunction seeks to remedy an alleged past constitutional injury. The decision to suspend and not renew Plaintiff's employment agreement was made on June 11, 2020. Unquestionably, Plaintiff does not face an imminent or ongoing constitutional violation. Accordingly, Plaintiff has not demonstrated irreparable injury and the Court must therefore deny Plaintiff's Motion for Preliminary Injunction.

### C. The issuance of an injunction is likely to cause Defendants substantial harm.

The concerns voiced by Library staff during the Zoom meeting illustrated that Plaintiff was an ineffective leader, did not understand the inner workings of the Library, and made inappropriate jokes of racist and sexual nature during work hours while at the Library. If Defendants are required to reinstate Plaintiff, and therefore are unable to hold him accountable for his undesirable behavior, the Library would be negatively impacted.

The issuance of an injunction would also impair Defendants' ability to locate a new Director. Defendants voted to begin their search for a new Director at the June 11, 2020 meeting. An injunction forcing Defendants to renew Plaintiff's employment agreement would undermine

these efforts.  Therefore, the issuance of a preliminary injunction is likely to cause substantial harm to the Library.

### D. Public interest lies with denying Plaintiff's motion for a preliminary injunction.

While the public unequivocally has an interest in vindicating constitutional rights, it is unlikely that Plaintiff can demonstrate that any constitutional rights were violated.  Moreover, "the public interest lies in promoting public confidence in the integrity of local government [...]." *See, e.g., Overstreet*, 305 F.3d at 579.  This interest is furthered by the denial of the injunction sought by Plaintiff.  Consequently, this factor provides no support for Plaintiff's request for a preliminary injunction.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff is unlikely to succeed on the merits of his claims and he will not suffer irreparable harm if the injunction is not issued.  Moreover, issuing an injunction would cause substantial harm to the Library such that the public interest would be served by denying, not granting, the injunction.  Accordingly, all factors weigh in favor of denying Plaintiff's motion for a preliminary injunction. Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

KEULER, KELLY, HUTCHINS.
BLANKENSHIP, & SIGLER LLP
100 South 4th Street, Suite 400
Paducah, KY 42001
Phone 270-448-8888 / Direct: 270-448-0999
Fax 270-442-0998

By: /s/ Stacey A. Blankenship
    Stacey A. Blankenship
    Kristen N. Worak

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2020, I electronically filed the foregoing with the Clerk of the Court by using the ECF system, which will send a notice of electronic filing to the following:

BRIAN SCHUETTE
SCHUETTE LAW GROUP
719 DISHMAN LANE EXT.
BOWLING GREEN, KY 42104
Email: brian@slg.legal
*Counsel for Plaintiff*

By: /s/ Stacey A. Blankenship
    Stacey A. Blankenship