IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | | |
|---|---|---|
| CALEB H. MAY, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| HENDERSON COUNTY PUBLIC | ) | |
| LIBRARY, | ) | |
| | ) | |
| JOAN HOFFMAN, Individually and in | ) | |
| her Official Capacity as Trustee, | ) | |
| | ) | |
| SUSAN THURMAN, Individually and in | ) | Case No. 4:20-cv-00108-JHM-HBB |
| her Official Capacity as Trustee, | ) | |
| | ) | JURY DEMAND |
| STEVE TWEDDELL, Individually and in | ) | |
| his Official Capacity as Trustee, | ) | |
| | ) | |
| BOBBIE JARRETT, Individually and in | ) | |
| her Official Capacity as Trustee, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| ARLENE ALEXANDER, Individually | ) | |
| and in her Official Capacity as Trustee, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO
MOTION FOR PRELIMINARY INJUNCTION**

Comes the Plaintiff, Caleb H. May, by counsel, and for his Reply to Defendants' Response

to his Motion for Preliminary Injunction states as follows.

**INTRODUCTION**

This is a First Amendment retaliation action arising out of the wrongful suspension and

subsequent termination of Plaintiff Caleb May's employment as Director of the Henderson County

1

Public Library. Plaintiff has filed a motion for preliminary injunction (Doc. 6), which is pending. Defendants (collectively referred to as "the HCPL" or "Library" or "Defendants") have filed their response (Doc. 10) and Plaintiff's reply is as follows.

**<u>REPLY</u>**

The Library's response is pretty standard fare for an employment-law-type case—an *ad hominem* attack that has little to do with the issues before the Court. It has obviously canvassed its employees and other sources to dredge up as many negative statements about May as it can find.

By the Library's account, May is a racist, bigoted, sexually-harassing, incompetent boor. It has painted a picture of a man so vile that his ability to hold the position of Director of the HCPL for nearly five (5) years is inexplicable. There is a good reason for this cognitive dissonance: the Library's purported justifications for terminating May are <u>wholly pretextual</u>.

But-for May's FaceBook posts regarding political and religious opinions on pressing cultural matters, he would still be employed by the Library. The fact that Plaintiff was fired in retaliation for expressing these views is borne out in several indisputable ways.

First, not a single reason advanced by the Library in its response was under consideration or even known prior to May's FaceBook posts—<u>not a single one</u>. (Declaration of May "Decl. of May" ¶ 5-10.) This alone compels the conclusion that the Library's proffered reasons for suspending and then terminating May are pretextual.

Second, May's job performance prior to the FaceBook posts was uniformly lauded by the HCPL's Board of Trustees, as illustrated by the following:

➢ May's employment contract was allowed to automatically renew in 2016, 2017, 2018 and 2019; this occurred because he was an excellent Director (Decl. of May ¶ 6);

➢ May received excellent performance evaluations from the Board of Trustees, year after year (Decl. of May ¶ 20);

➢ May never received a negative performance evaluation in the years before the FaceBook posts (Decl. of May ¶ 20);

2

➢ May was <u>never</u> the subject of any complaints of misconduct or employee discipline (Decl. of May ¶ 7); and

➢ Each year, May received substantial raises in recognition of his excellent job performance; May's annual salary was $75,000 when he started and $96,754.19 at the time of his termination (29.01% increase) (Decl. of May ¶ 10).

Third, during his nearly 5-year tenure as Director, May implemented many improvements to the Library's operations and programs, as illustrated by the following:

➢ Successfully overseeing an $8,000,000 expansion to the HCPL facility (Decl. of May ¶ 11);

➢ "How-To" days on a variety of topics, such as 1) estate planning; 2) fencing; and 3) managing a bee hive (Decl. of May ¶ 12 a.);

➢ The Genealogy Lunch Bunch (to assist patrons in conducting genealogical research) (Decl. of May ¶ 12 b.);

➢ Sponsoring of an African Drums Troop Program (Decl. of May ¶ 12 c.);

➢ Hosting Jazz Night, led by E.J. Simmons, a local African American worship pastor (Decl. of May ¶ 12 d.);

➢ Hosting Gospel Music Night, also led by E.J. Simmons (Decl. of May ¶ 12 e.);

➢ Implementing the RFID Project (which entailed installing radio frequency identification devices in all library items) (Decl. of May ¶ 12 f.);

➢ Installation of access controls for library staff entrances (for enhanced employee safety) (Decl. of May ¶ 12 g.);

➢ Promoting Banned Book Week (ironically enough, to promote awareness of First Amendment free speech protections) (Decl. of May ¶ 12 h.);

➢ Holding the "42420 Event," in which patrons' overdue library fines were forgiven as a way of generating good news in the early days of the COVID-19 Pandemic (Decl. of May ¶ 12 i.); and

➢ Replacing and displaying a plaque commemorating the work of Mariah Powell Carr, an African American woman who led the library for African Americans during segregation (Decl. of May ¶ 13).

Fourth, beyond the expansion of HCPL's programming, May encouraged collaboration between the Library and various community groups, including:

- ➢ "Food for Fines," in which patrons who owed fines were allowed to pay with donations to local food banks (Decl. of May ¶ 14 a.);

- ➢ Working with the Henderson County Schools under a 21st Century Grant to support underprivileged high school students (Decl. of May ¶ 14 b.);

- ➢ Celebrating the Henderson County Schools Sesquicentennial Project, which grew into a permanent community history education committee (Decl. of May ¶ 14 c.);

- ➢ Utilizing a grant from the Kentucky Humanities Council to hold "Primetime Family Story Time" to offer a family story time for at-risk families (Decl. of May ¶ 14 d.);

- ➢ Providing mobile internet hotspots and charging stations for The W.C. Handy Blues and Barbecue Festival (Decl. of May ¶ 14 e.); and

- ➢ Re-engaging the local NAACP chapter by making library facilities available for meetings, something that had stopped under previous leadership because the participants felt unwelcome (Decl. of May ¶ 14 f.).

Fifth, in addition to his activities at the Library, May was active in the Henderson community, including the following:

- ➢ Active member at Zion Baptist Church in Henderson (Decl. of May ¶ 15 a.);

- ➢ Active member of the Lion's Club, including serving as the song leader and as a member of the board (Decl. of May ¶ 15 b.);

- ➢ Serving as a guest speaker at the Rotary Club, the Retired Teachers Association, and area churches (Decl. of May ¶ 15 c.);

- ➢ Serving on the board of the Gathering Place (a local community center for senior citizens) (Decl. of May ¶ 15 d.);

- ➢ Serving as a judge for class projects at the Henderson Community College (Decl. of May ¶ 15 e.); and

- ➢ Serving as an awards presenter for the Henderson Homeless Coalition (Decl. of May ¶ 15 f.).

Contrary to the fictional narrative promoted by the Library in its response, May was an effective Library Director and should be given the opportunity to remain so.

## MAY'S RESPONSE TO THE LIBRARY'S SPECIFIC ALLEGATIONS

The Library's specific allegations against May, separated and numbered for clarity, and his responses are as follows:

### The Library's Allegations #1

*"…Plaintiff did not know how to use the Library catalog system, run the circulation desk, or perform jobs of Library employees." (P.4 of 22) "Plaintiff also had issues updating the catalog system and the library's collection of items." (Doc. 10, Page 4)*

### May's Response #1

May's position was that of Director of the HCPL. This entailed leading a staff of employees whose expertise in the minutiae of their particular positions would naturally exceed that of May. Surely it is not the position of the Library that the Director is supposed to be able to do every job in the building. That's not how organizational leadership works. (Decl. of May ¶ 18).

If this were an actual issue, it would have been raised in May's annual performance evaluation or at least informally, which it never was. Perhaps that is why the Library did not include May's evaluations in its response.

### The Library's Allegation #2

*"When Library staff attended conferences, individuals not associated with the Library also voiced concern to Library staff about Plaintiff's abilities as the Director of the Library." (Doc. 10, Page 4).*

### May's Response #2

This allegation is sharply at odds with five years' worth of the Trustees' own evaluations of May. It would appear that they are now suggesting that their repeated written performance evaluations of May (supported by multiple contract renewals and substantial annual salary increases) should be disregarded in favor of non-specific criticisms voiced at unspecified times by unknown people at unidentified conferences. (Decl. of May ¶ 20).

Further, if May was actually underperforming, his annual evaluations would have reflected such problems—which they do not.

### The Library's Allegation #3

*"…Plaintiff could not perform as an effectual leader and was often indecisive." (p.4 of 22) "…showing favoritism to certain employees, not having control over certain employees' actions, not listening to employees' concerns, miscommunication, and dishonesty." (Doc. 10, Page 4).*

### May's Response #3

May's leadership style was to seek input from fellow employees to build consensus before making or implementing a decision. He dealt with employees in a fair and even-handed manner. He did not show favoritism and was never accused of dishonesty of any sort. Until May's FaceBook posts, the Trustees were always complimentary of May's leadership. His evaluations reinforce this characterization of his effectiveness and refute the pretextual reasons now advanced by the Library. (Decl. of May ¶ 22).

### The Library's Allegation #4

*"During employee evaluations, Plaintiff discussed his views on current political affairs and the COVID-19 pandemic." (Doc. 10, Page 4).*

### May's Response #4

May conducted annual employee performance evaluations in late May of 2020, just over three months into the COVID-19 Pandemic. Obviously, the pandemic has been a polarizing issue across the country. For his part as Director of the HCPL, May was diligent to follow each and every directive related to operation of the Library. All of the employees undergoing evaluation either made comments or posed questions about the Pandemic, including references to the performance of government leaders. May responded to these questions appropriately. (Decl. of May ¶ 24).

Nevertheless, there were employees that thought he was doing too much and others who thought he was doing too little. It could not have been difficult to find someone to criticize his response. That being said, the Trustees had nothing but the highest praise for May's handling of the pandemic on behalf of the Library. The only plausible explanation for their change of heart is their current effort to justify violating May's First Amendment rights. (Decl. of May ¶ 24).

**The Library's Allegation #5**

*"Plaintiff was also critical of employees outside of their presence and he often pitted employees against each other." (Doc. 10, Page 4).*

**May's Response #5**

One of the duties of a manager is to evaluate the performance of employees. This often requires critiquing them outside of their presence, which May did from time to time in collaboration with the Assistant Director of the HCPL, Amber Potts. He never "pitted employees against each other." He did, however, encourage employees who were having inter-personal difficulties to talk with each other and work things out. Under any other circumstance, May's approach would be treated as an example of good management. (Decl. of May ¶ 26).

As with the other issues, May's leadership in personnel matters was never questioned until the Library found itself defending this legal action.

**The Library's Allegation #6**

*"…Plaintiff brought his children to the library and expected Library staff to babysit them." (Doc. 10, Page 4).*

**May's Response #6**

May never asked or permitted Library staff to babysit his children. There were occasions when his children would be at the Library as patrons participating in Library programs. However, he never attempted to rely on Library employees to watch his children. (Decl. of May ¶ 28).

**The Library's Allegation #7**

*"On one occasion, Plaintiff and his spouse left the library for the day without realizing that they had forgotten one of their children at the Library." (Doc. 10, Page 4)*

**May's Response #7**

This allegation is a malicious mischaracterization of an instance in which one of May's six children failed to follow the rest of the family to the parking lot. Before the doors to the vehicle were even closed, they noted the child's absence and promptly retrieved the child. If the Library really believed that May and his spouse were neglecting any of their children, they would have reported it

to social services. This, of course, did not happen because it was a non-incident in which the child was never in danger. (Decl. of May ¶ 30).

### The Library's Allegation #8

*"…Plaintiff allowed his spouse to use his key fob to gain access to the Library through the staff-only entrance." (Doc. 10, Page 5).*

### May's Response #8

May's spouse never accessed the staff-only entrance to the Library with his key fob without his knowledge or presence. (Decl. of May ¶ 32).

### The Library's Allegation #9

*"Plaintiff's spouse would come to the Library, monitor the staff, and then recommend to Plaintiff that he discipline them for failing to perform their job duties." (Doc. 10, Page 5).*

### May's Response #9

May's entire family, including his spouse, patronized the Library often. Never once did she attempt to bring about the discipline of an employee nor did May ever "discipline" a staff member at his wife's behest. (Decl. of May ¶ 34).

### The Library's Allegation #10

*"Plaintiff's spouse would also interrupt Library meetings." (Doc. 10, Page 5).*

### May's Response #10

May worked long hours as Director of the HCPL. During the long hours, but only on a few rare occasions, May received a call from his spouse during a meeting. In each instance, the calls involved urgent matters that required his immediate attention. He extended to other employees the same opportunity to deal with urgent matters when they arose. (Decl. of May ¶ 36).

This is, again, an example of an issue that would have been reflected in his performance evaluations, which it was not.

### The Library's Allegation #11

*"On one occasion, plaintiff discussed a groin issue with a female employee…[s]he perceived this discussion to concern Plaintiff's penis." (Doc. 10, Page 5).*

### May's Response #11

In August of 2019, May had an issue that required medical attention. In a confidential conversation with Assistant Director Amber Potts, May stated in general terms that he had a painful issue in his groin area. The only terms that were used were medical terms and the word "penis" was never uttered. If Amber Potts actually felt that this was inappropriate, she could have indicated her discomfort and/or reported it to the board at May's annual job performance meeting less than two months after this event. The issue did not come up because it was not inappropriate conduct at that time nor does it justify the Library's recent discipline and termination of May. (Decl. of May ¶ 38).

### The Library's Allegation #12

*"Against the desire of Library staff, Plaintiff also recited love poems to female employees while they performed their duties and responsibilities…Plaintiff commented on the apparel and outward appearance of Library staff…He also made an unwanted remark about a female employee's long legs." (Doc. 10, Page 5).*

### May's Response #12

Like many people in the library field, May is a fan of poetry, having committed several passages to memory. Occasionally in the spirit of spontaneity and camaraderie, May recited poetry in the presence of employees. While some of these poems may be considered "romantic poems," they were not presented in a suggestive manner. (Decl. of May ¶ 40).

With regard to the attire of others, May did from time to time make observations about an article of clothing that he liked. As with the poetry, these comments were never made in an inappropriate way and he never received feedback that would suggest otherwise. He never commented on anyone's "long legs." (Decl. of May ¶ 40)

### The Library's Allegation #13

*"Additionally, Henderson's downtown area has sculptures of birds taken from John James Audubon paintings. When Plaintiff was asked by a patron where the statues were [they were temporarily removed for maintenance], Plaintiff repeatedly replied 'you mean the horny hooters-we call them the horny hooters.' The sculpture is of two great horned owls." (Doc. 10, Page 8).*

The great horned owl statue at the library was dedicated in 2006, nearly a decade before the start of May's tenure. A long time employee of the library told May that it was a running joke among the staff to refer to the statue as the, "horny hooters." May used the phrase in jest at times, but only amongst employees. (Decl. of May ¶ 42).

None of these matters were ever issues prior to May's FaceBook post. (Decl. of May ¶ 20). The only reason they are being brought up now is to support the Library's false and pretextual narrative about his job performance. And, again, there is nothing in May's performance evaluations to suggest that he was engaging in actual inappropriate conduct.

### The Library's Allegation #14

*"Prior to one meeting [of the NAACP at the Library], Plaintiff approached Carla Bradley, Circulation Manager for the Library and an African American, and asked her 'What do y'all like to be called: Black, Negros, or African American.'" (Doc. 10, Page 5).*

### May's Response #14

Several years ago, May was asked to speak to the NAACP. Having never addressed an African American audience in this type of setting before, May wanted to be sensitive to the group's preferences. As a part of this effort, he simply asked African American employee Carla Bradley for her opinion regarding the terminology of "Black" or "African American." During the discussion, he remarked that when he was in grade school, he was told that "Negro" was the proper term, but that he knew it had fallen out of favor. (Decl. of May ¶ 44).

Far from being racist, May was actually demonstrating sensitivity and courtesy. That this is now being deliberately misconstrued to suggest racial animus on May's part is both misleading and offensive.

This is yet another instance of a purported justification for adverse action that finds no support in May's performance evaluations or otherwise. Surely it would have been brought up if it was a genuine issue.

### The Library's Allegation #15

*"On another occasion, Plaintiff went to a different African American employee's office and, without provocation, started a conversation by stating, "well, unfortunately my family owned slaves." (Doc. 10, Page 5-6).*

### May's Response #15

One of May's hobbies is genealogy and family history research. On a couple of instances, he had conversations with an African American employee regarding race relations. In the course of these conversations, May on one occasion mentioned that since many of his ancestors immigrated to the US after the abolition of slavery, he didn't think any of his ancestors owned slaves. In another conversation, May lamented his discovery that some of his ancestors did, in fact, own slaves. (Decl. of May ¶ 46).

### The Library's Allegation #16

*"Despite the workforce tension, Plaintiff approached an African American employee to discuss his FaceBook posts…the employee indicated to Plaintiff that she did not wish to discuss the Facebook posts and would prefer to continue to work; however, Plaintiff interfered with her ability to perform her job duties and continued to discuss his Facebook posts." (Doc. 10, Page 6).*

### May's Response #16

On the day in question, May made the rounds at the Library, checking in on employees. When he tried to speak with the African American employee in question, she avoided him and retreated to her office. He followed her to inquire whether her actions were related to his FaceBook posts. She responded by yelling and stating that he shouldn't have to ask and then refused to speak with him further. Perhaps, if she had given May an opportunity to explain the intent of his privately-expressed views, she would have understood that he was making political and religious observations, not expressing negative racial ideas. The fact that May was not expressing racist sentiments seems to be

11

lost on those who are intent on destroying him for expressing opinions with which they may disagree. These are the very types of free expression that the First Amendment is designed to protect. (Decl. of May ¶ 48).

### The Library's Allegation #17

*"…Plaintiff turned to Ms. Bradley and randomly stated to her and the employee that Henderson County's 'old money' came from families who farmed cash crops with slaves." (Doc. 10, Page 6).*

### May's Response #17

The job evaluation in question was with a young employee who is very innovative regarding the planning of library programs and events. May was brainstorming about possible future programs when he remarked that Henderson County was at one time the third largest slave-owning county in Kentucky. He viewed this as something to be overcome and thought that a program bringing together African Americans and the descendants of former slave owners could be helpful—in the nature of formal apologies that are sometimes made to descendants of the victims of racial injustice. For example, in 1995, the Southern Baptist Convention issued a formal apology for its 19th Century position on slavery.[1] May was motivated by a desire to bring about peace and reconciliation. (Decl. of May ¶ 50).

### The Library's Allegation #18

*"Plaintiff told this joke in the presence of a female employee: [stranger to farmer where a female was working in the yard] 'Is that your little nagger?' Farmer: 'No, that's my wife, the nagger is in the kitchen.'" (Doc. 10, Page 7).*

### May's Response #18

May's grandfather passed away on August 30, 2018. As he was grieving his grandfather's passing, May reflected on some of the jokes that he used to tell that would not be appropriate by today's standards. In a short personal conversation with a coworker, May mentioned one of these

---

[1] See https://www.npr.org/templates/story/story.php?storyId=112329862.

"old fashioned" jokes that contained the phrase, "is your wife a big nagger?" "No, she's a little white girl." The point of this reminiscence was to observe how much standards had changed; it was never related as a joke. If the coworker was truly concerned about it, it would have been reported at the time. (Decl. of May ¶ 52).

If this conversation was inappropriate, Amber Potts would have reported it then. The fact that she did not demonstrates that it was not.

### The Library's Allegation #19

*"A female patron came to the library in the summer and Plaintiff commented in front of female employees about her revealing clothes and physique." (Doc. 10, Page 8).*

### May's Response #19

As the person responsible for overall operation of the Library, it fell upon May to enforce standards regarding appropriate attire. When such occasions arose regarding female patrons, it was May's practice to ask one or more female employees if they felt that the attire was inappropriate and, if so, whether it merited a conversation with the patron. He would then defer to the opinions of female co-workers. (Decl. of May ¶ 54).

The insinuation in the Library's response was that May was addressing these issues in an inappropriate way, which is simply false.

### The Library's Allegation #20

*"A different female patron brought her child to story hour. She stepped away to a quiet, private area to breast feed her infant. Plaintiff followed her, engaged in conversation with her, stared at her and made her feel uncomfortable." (Doc. 10, Page 8).*

### May Response #20

There is a quiet nursing area in the ante-room of the Library, just outside of the women's restroom, complete with a rocking chair. If someone wants a quiet, private area to nurse, that is the best place. May never interacted with patrons, breastfeeding or not, in the private ante-room outside of the women's restroom. (Decl. of May ¶ 56).

### The Library's Allegation #21

*"An African American female employee wanted to have the annual black history month event in an area in Henderson where many African Americans reside. Plaintiff delayed the decision on the location until it was too late, and the event had to be conducted at the traditional location; the Presbyterian Church across the street from the library."* (Doc. 10, Page 8).

### May Response #21

In the last few years, the $8,000,000.00 library expansion and renovation project increasingly consumed May's time. He interacted with architects, financial planners, contractors and the like. Some approvals did not occur immediately, though everything was taken care of in a timely manner. Apparently, one of these delays impacted persons interested in hosting a Black History Month event. It was, by no means, based upon the nature of the activity or the identity of the persons making the request. (Decl. of May ¶ 58).

On February 16, 2019 Black History Month activities and crafts were done in the Children's Library at HCPL and the feature program, "Rhymes, Roots and Rhythm," featuring the Sankofa Drum and Dance Company from Nashville, occurred across the street at the Presbyterian Church. May and his family attended as well as many African Americans and individuals from many different ethnic backgrounds. This was one of the most successful Black History Month programs that the library has ever had. (Decl. of May ¶ 58).

### The Library's Allegation #22

*"The female employees stated that if you're white, male, and protestant, your ideas are good. If not, your ideas are not good."* (Doc. 10, Page 8).

### May's Response #22

This allegation is ridiculous on its face. Besides May, only one or two other employees at the library fit the description of, "…white, male, and protestant." There would never be any programs, item purchases, policies, or anything else at the library if only ideas from the described stereotype group were considered. (Decl. of May ¶ 60).

As with the other allegations, none of these alleged instances were brought up prior to the FaceBook posts.

<b><u>REPUTATIONAL HARM</u></b>

The most compelling reason justifying preliminary injunctive relief is the reputational harm that May has suffered due to the Library's actions. Without reinstatement to his position as Director of the HCPL, May will have no meaningful way to overcome being falsely labeled as a bigot. Nothing illustrates this truth more vividly than May's efforts to find other employment in his field. In response to approximately fifty applications, May has been given four interviews but has received no offers. (Decl. of May ¶ 61-64). At least one of the job recruiters with whom May has spoken told him that the Library's response to his FaceBook post will be difficult to overcome. Below is a list of the positions for which he has applied:

- Pensacola Christian College – Library Director
- Dodge City Public Library – Library Director
- Muskingum County Library System – Muskingum County Library System Director – Ohio
- Mid-Atlantic Christian University – Library Director
- City of Lincoln, NE – Libraries - Assistant Library Director
- Library Director - Kiowa County Library
- Laurel Jones County Library System, Inc,. (Director)
- Catoosa County Library – Library Director
- U.S. Department of the Army – Supervisory Librarian
- Canyon Lake, TX – Library Director
- Brewton-Parker College, Inc. - Director of Library & Information Services
- Carolina University – Library Director
- Billy Graham Library – Archivist
- Librarian (Pentagon) –
- Supervisory Librarian (NIH)
- Cleveland Count Library System – Library Director
- Library of Congress - Supervisory Librarian (Chief, Network Section)
- City of Enid, OK – Library Director
- City of Urbandale – Library Director
- Library Adult Services Manager-City of Ames, IA
- Eastern Oklahoma Library System – Assistant Director
- Metropolitan Library Comm. of Okla.–Director of Outreach and Engagement Services
- State of Louisiana – Consultant
- Missouri Baptist University, Library Services, User & Engagement Services Specialist
- Rosenberg Library, Library Executive Director

- Fayetteville Public LibraryDirector of Development (7/23/20)
- Burnet County Texas – Library Director
- Allen County Public Library (Indiana) – Senior Librarian – Genealogist
- Council Bluffs, Iowa – Library Director –
- Marion, IL – Library Director
- State Library Deputy Director – Arkansas –
- Lawton, OK – Deputy Library Director
- Library Director – Boise Public Library
- Librarian IV – Houston Public Library
- Library Director – Anderson Public Library
- Library Director – Jefferson County Library (MO)
- Librarian (NOAA) –
- Information Services Manager (Prince William County Libraries)
- Kansas Chamber of Commerce
- Library Branch Manager (Waco, TX)
- Executive Director – Mid-America Library Alliance
- Library Director – Grant County Public Library
- Central Library Manager – Garland Library
- Community Engagement Librarian – Mansfield Public Library (TX)
- Crawford County Library System Director – Crawford County, Arkansas
- Library Director – Beaufort County Library System
- Librarian – Davis Correctional Facility
- Library Manager – Southern Boone County Public Library Director
- Archivist – Billy Graham Evangelistic Association
- Library Director – Newton Public Library

## **LEGAL DISCUSSION**

First Amendment retaliation claims follow a burden-shifting analysis that is substantially identical to the familiar McDonnell-Douglas framework. The third element of the McDonnell Douglas framework is proof by the plaintiff that the defendant's proffered reason for adverse action is a pretext for unlawful discrimination. "Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible. *Id.* at 256, 101 S.Ct. at 1095." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342–43 (6th Cir. 1997). As amply demonstrated in this reply, the Library's proffered reasons for adverse action against May are quintessentially pretextual.

On a separate note, the Library takes the remarkable position that May's speech as a private citizen does not address a matter of inherent public concern and, thus, is not protected under the First Amendment. (Doc. 10, Page 11). Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *Snyder v. Phelps*, 131 S.Ct. 1207, 1216, 562 U.S. 443, 453 (U.S.,2011), citing *Connick*, 103 S.Ct. 1684, or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public," *San Diego v. Roe,* 125 S.Ct. 521. See *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492–494, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Time, Inc. v. Hill*, 385 U.S. 374, 387–388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

The Library's contention is fundamentally flawed in that it fails to take into account the public attention being given to the subject of race relations, politics in a presidential election year and the unprecedented global pandemic. It is precisely *because* of the character and context of the May's speech that it is deserving of such protection and outweighs any theoretical *de minimus* effect it had on working relationships within the Library. The content of May's speech plainly relates to broad issues of interest to society at large, rather than matters of purely private concern.

Defendants base much of their argument regarding the lack of public concern on an unreported case of *Pacheco v. Waldrop*, No. 5:13-cv-00044-TBR, 2013 WL 2581016 (W.D. Ky. June 11, 2013). In *Pacheco*, a school teacher's letter to the editor in which she falsely and recklessly warned of a possible bomb threat in her school was undeserving of constitutional protection because the Defendant came forward with evidence of the false and reckless nature of her allegations. *Id.* at *9. In addition, unlike May's comments, Pacheco's speech was critical of her superiors within the school district and caused substantial disruption, *i.e.* a temporary shutdown of the schools and a police search for explosive devices.[2]

It is easy to discern the reason why the Library seeks to minimize the public concern aspect of the Plaintiff's speech. Such a position would excuse the Defendants' failure to follow the Sixth Circuit's clear directive that when disciplining a public employee because of their exercise of free speech, "[t]he government must make a strong showing where the speech substantially involves matters of public concern." *Miller v. City of Canton*, 319 F.App'x 411, 417 (6th Cir. 2009)(citing *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001).

Similarly, the Defendants' argument that May's speech is undeserving of protection because it was "likely to foment controversy and disruption" is inconsistent with established Sixth Circuit precedent. Even were this allegation true, it is not a basis for denying such speech constitutional protection. The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).[3]

<u>CONCLUSION</u>

This case presents the Court with an opportunity to use its equitable powers to right a serious wrong. While there is no way to turn back the clock, reinstating May to his position as Director of the Henderson County Public Library would begin to repair his reputation. It would also send an important message that the First Amendment rights of government employees are to be taken seriously—even when doing so requires courage.

---

[3] In support of this proposition, Defendants cite to *Venable v. Metro Government of Nashville, Davidson County, Tennessee*, 430 F.Supp.3d 350 (M.D.Tenn. 2019). *Venable* involved a police officer whose statements the court found "touched on matters of public concern: he was discussing his personal views about police officers and the dangers they face. Officer-involved shooting are a matter of public concern and the subject of nationwide debate."). *Id.* at 359. The Court went further to recognize that police officers are held to a higher standard than an ordinary person when it comes to the exercise of their speech and the consequences upon the ability of a police department to fulfill its duties. *Id.* at fn. 21.

For the foregoing reasons, the Court should grant the requested relief.

Respectfully submitted,

/s Brian Schuette, Esq.
SCHUETTE LAW GROUP
719 Dishman Lane Ext.
Bowling Green, KY 42104
(270) 781-7500 Voice
(270) 781-7533 Facsimile
(270) 320-7500 Mobile
brian@slg.legal
*Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true and exact copy of the foregoing was this 29th day of September,

2020 filed through the Court's e-filing system and thereby served upon the following:

Stacey A. Blankenship
Keuler Kelly Hutchins Blankenship & Sigler, LLP
100 S. Fourth Street, Suite 400
Paducah, KY 42001
sblankenship@kkhblaw.com

/s Brian Schuette, Esq.