## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

| | | |
|---|---|---|
| CALEB H. MAY, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| HENDERSON COUNTY PUBLIC | ) | |
| LIBRARY, | ) | |
| | ) | |
| JOAN HOFFMAN, Individually and in | ) | |
| her Official Capacity as Trustee, | ) | |
| | ) | |
| SUSAN THURMAN, Individually and in | ) | Case No. 4:20-cv-00108-JHM-HBB |
| her Official Capacity as Trustee, | ) | |
| | ) | **JURY DEMAND** |
| STEVE TWEDDELL, Individually and in | ) | |
| his Official Capacity as Trustee, | ) | |
| | ) | |
| BOBBIE JARRETT, Individually and in | ) | |
| her Official Capacity as Trustee, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| ARLENE ALEXANDER, Individually | ) | |
| and in her Official Capacity as Trustee, | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF PLAINTIFF CALEB MAY

Comes the Plaintiff, Caleb H. May, and for his Declaration, states as follows:

1. My name is Caleb H. May and I am an adult citizen and resident of Henderson, Henderson County, Kentucky.

2. I am the Plaintiff in this civil action.

3. I deny that I hold to racist, bigoted, sexually-harassing viewpoints.

1

4. I also deny that I was incompetent in carrying out my responsibilities as Director of the Henderson County Public Library.

5. Prior to the issue with my FaceBook posts, none of the alleged issues raised by the Defendants in their response had ever been raised or even mentioned to me or, to my knowledge, anyone else.

6. Each and every job review that I received before my FaceBook posts was favorable and positive.

7. Prior to my FaceBook posts, I was never the subject of any complaints regarding my conduct, my job performance or anything else.

8. My employment contract was allowed to automatically renew in 2016, 2017, 2018 and 2019 based upon my good job performance.

9. Each year, I received substantial raises in recognition of my job performance, even though I never requested a raise.

10. My starting annual salary in 2015 was $75,000 and my salary at the time of my termination was $96,754.19, plus substantial benefits.

11. While serving as Director of the HCPL, I successfully oversaw an $8,000,000 expansion to the HCPL facility.

12. I led the effort to improve the programming of the HCPL, including the following:

    a. Holding "How-To" days on a variety of topics, such as 1) estate planning; 2) fencing; and 3) managing a bee hive;

    b. The Genealogy Lunch Bunch (to assist patrons in conducting genealogical research);

    c. Sponsoring of an African Drums Troop Program;

    d. Hosting Jazz Night, led by E.J. Simmons, a local African American worship pastor;

    e. Hosting Gospel Music Night, also led by E.J. Simmons;

f. Implementing the RFID Project (which entailed installing radio frequency identification devices in all library items);

g. Installation of access controls for library staff entrances (for enhanced employee safety);

h. Promoting Banned Book Week; and

i. Holding the "42420 Event," in which patrons' overdue library fines were forgiven as a way of generating good news in the early days of the COVID-19 Pandemic; and

13. I replaced and put on display a plaque commemorating the work of Mariah Powell Carr, an African American woman who led the library for African Americans during segregation.

14. I encouraged greater collaboration between the Library and various community groups, including:

a. "Food for Fines," in which patrons who owed fines were allowed to pay with donations to local food banks;

b. Working with the Henderson County Schools under a 21st Century Grant to support underprivileged high school students;

c. Celebrating the Henderson County Schools Sesquicentennial Project, which grew into a permanent community history education committee;

d. Utilizing a grant from the Kentucky Humanities Council to hold "Primetime Family Story Time" to offer a family story time for at-risk families;

e. Providing mobile internet hotspots and charging stations for The W.C. Handy Blues and Barbecue Festival; and

f. Re-engaging the local NAACP chapter by making library facilities available for meetings, something that had stopped under previous leadership because the participants felt unwelcome.

15. In addition to carrying out my responsibilities at the Library, I was active in the Henderson community, including the following:

a. Active member at Zion Baptist Church in Henderson;

b. Active member of the Lion's Club, including serving as the song leader and as a member of the board;

c. Serving as a guest speaker at the Rotary Club, the Retired Teachers Association and area churches;

d. Serving on the board of the Gathering Place (a local community center for senior citizens);

e. Serving as a judge for class projects at the Henderson Community College; and

f. Serving as a presenter for the Henderson Homeless Coalition.

16. For the sake of clarity, I have separated and numbered each of the Library's allegations against me.

17. **The Library's Allegations #1** *"…Plaintiff did not know how to use the Library catalog system, run the circulation desk, or perform jobs of Library employees." (P.4 of 22); "Plaintiff also had issues updating the catalog system and the library's collection of items." (P.4 of 22).*

18. **My Response to #1**. My position was that of Director of the HCPL. This entailed leading a staff of employees whose expertise in the minutiae of their particular positions often exceeded mine. I was never expected to be able to do every job in the building. My role was to lead the staff as a whole. These allegations are inconsistent with my performance evaluations.

19. **The Library's Allegation #2**. *"When Library staff attended conferences, individuals not associated with the Library also voiced concern to Library staff about Plaintiff's abilities as the Director of the Library." (p.4 of 22).*

20. **My Response to #2**. This allegation is sharply at odds with five years' worth of the Trustees' evaluations of my performance. There are better indications of my performance, namely, the multiple contract renewals and substantial annual salary increases. Prior to reading the Library's response, I had never even heard of these criticisms, which are inconsistent with the Trustees' multiple performance evaluations.

21. **The Library's Allegation #3**. *"…Plaintiff could not perform as an effectual leader and was often indecisive." (p.4 of 22); "…showing favoritism to certain employees, not having control over certain employees' actions, not listening to employees' concerns, miscommunication, and dishonesty." (p.4 of 22).*

22. **My Response to #3**. My leadership style was to seek input from fellow employees to build consensus before making or implementing a decision. I dealt with employees in a fair and even-handed manner. I did not show favoritism and was never accused of dishonesty of any sort. Until my FaceBook posts, the Trustees were always complimentary of my leadership. Until reading the response, I had never even heard allegations of this sort.

23. **The Library's Allegation #4**. *"During employee evaluations, Plaintiff discussed his views on current political affairs and the COVID-19 pandemic." (p.4 of 22).*

24. **My Response to #4**. I conducted annual employee performance evaluations in late May of 2020, just over three months into the COVID-19 Pandemic. Obviously, the pandemic has been a polarizing issue across the country. As Director of the HCPL, I was diligent to follow each and every directive related to operation of the Library. All of the employees undergoing evaluation either made comments or posed questions about the Pandemic, including references to the performance of government leaders. I responded to these questions appropriately. Nevertheless, there were employees who thought I was doing too much and others who thought I was doing too little. That being said, the Trustees had nothing but the highest praise for my handling of the pandemic on behalf of the Library.

25. **The Library's Allegation #5**. *"Plaintiff was also critical of employees outside of their presence and he often pitted employees against each other." (p.4 of 22).*

26. **My Response to #5**. One of my duties as Director was to evaluate the performance of employees. This often required critiquing them outside of their presence, which I did from time to time in collaboration with the Assistant Director of the HCPL, Amber Potts. I

5

never "pitted employees against each other." I did, however, encourage employees who were having inter-personal difficulties to talk with each other and work things out. Until the response, my approach to managing employees was never criticized.

27. **The Library's Allegation #6**. *"…Plaintiff brought his children to the library and expected Library staff to babysit them." (p.4 of 22).*

28. **My Response to #6.** I never asked or permitted Library staff to babysit my children. There were occasions when my children would be at the Library as patrons participating in Library programs. However, I never attempted to rely on Library employees to watch my children.

29. **The Library's Allegation #7**. *"On one occasion, Plaintiff and his spouse left the library for the day without realizing that they had forgotten one of their children at the Library." (p.4 of 22).*

30. **My Response to #7**. This allegation is a malicious mischaracterization of an instance in which one of my six children failed to follow the rest of the family to the parking lot. Before the doors to the vehicle were even closed, we noted the child's absence and promptly retrieved the child. The implication that my child was in danger is completely false.

31. **The Library's Allegation #8**. *"…Plaintiff allowed his spouse to use his key fob to gain access to the Library through the staff-only entrance." (p.5 of 22).*

32. **My Response to #8**. My spouse never accessed the staff-only entrance to the Library with my key fob, without my knowledge or presence.

33. **The Library's Allegation #9**. *"Plaintiff's spouse would come to the Library, monitor the staff, and then recommend to Plaintiff that he discipline them for failing to perform their job duties." (p.5 of 22).*

34. **My Response to #9**. My entire family, including my spouse, patronized the Library often. Never once did my wife attempt to bring about the discipline of an employee nor did I ever "discipline" a staff member at my spouse's behest.

35.  **The Library's Allegation #10**. *"Plaintiff's spouse would also interrupt Library meetings."* *(p. 5 of 22)*.

36.  **My Response to #10**. I worked long hours as Director of the HCPL. During those long hours, but only on a few rare occasions, I received a call from my spouse during a meeting. In each instance, the calls involved urgent matters that required immediate attention. I always extended to other employees the same opportunity to deal with urgent matters when they arose.

37.  **The Library's Allegation #11**. *"On one occasion, plaintiff discussed a groin issue with a female employee…[s]he perceived this discussion to concern Plaintiff's penis." (p.5 of 22)*.

38.  **My Response to #11**. In August of 2019, I had an issue that required medical attention. In a confidential conversation with Assistant Director Amber Potts, I stated in general terms that I had a painful issue in my groin area. The only terms that were used were medical terms and the word "penis" was never uttered. Amber Potts gave no indication of offense at the time, nor was it brought up at my annual job performance meeting less than two months after this event.

39.  **The Library's Allegation #12**. *"Against the desire of Library staff, Plaintiff also recited love poems to female employees while they performed their duties and responsibilities…Plaintiff commented on the apparel and outward appearance of Library staff…He also made an unwanted remark about a female employee's long legs." (p.5 of 22)*.

40.  **My Response to #12**. Like many people in the library field, I am a fan of poetry, having committed several passages to memory. Occasionally in the spirit of spontaneity and camaraderie, I recited poetry in the presence of employees. While some of these poems may be considered "romantic poems," they were not presented in a suggestive manner. With regard to the attire of others, I did from time to time make observations about an article of clothing that I liked. As with the poetry, these comments were never made in an inappropriate way and I never received

7

feedback that would suggest otherwise. I never commented on anyone's "long legs." None of these matters were ever issues prior to my FaceBook posts.

41. **The Library's Allegation #13** *"Additionally, Henderson's downtown area has sculptures of birds taken from John James Audubon paintings. When Plaintiff was asked by a patron where the statues were [they were temporarily removed for maintenance], Plaintiff repeatedly replied 'you mean the horny hooters-we call them the horny hooters.' The sculpture is of two great horned owls." (p. 8 of 22)*

42. **My Response to #13**. The great horned owl statue at the library was dedicated in 2006, nearly a decade before the start of my tenure. A long-time employee of the library told me that it was a running joke among the staff to refer to the statue as the, "horny hooters." I used the phrase in jest at times, but only amongst employees. None of these matters were ever issues prior to my FaceBook posts.

43. **The Library's Allegation #14**. *"Prior to one meeting [of the NAACP at the Library], Plaintiff approached Carla Bradley, Circulation Manager for the Library and an African American, and asked her 'What do y'all like to be called: Black, Negros, or African American.'"(p.5 of 22).*

44. **My Response to #14**. Several years ago, I was asked to speak to the NAACP. Having never addressed an African American audience in this type of setting before, I wanted to be sensitive to the group's preferences. As a part of this effort, I simply asked an African American employee if she preferred the terminology of "Black" or "African American." During the discussion, I remarked that when I was in grade school, I was told that "Negro" was the proper term, but that I knew it had fallen out of favor. I was actually attempting to demonstrate sensitivity and courtesy.

45. **The Library's Allegation #15**. *"On another occasion, Plaintiff went to a different African American employee's office and, without provocation, started a conversation by stating, "well, unfortunately my family owned slaves."(p. 5-6 of 22).*

46. **My Response to #15**. One of my hobbies is genealogy and family history research. On a couple of instances, I have had conversations with an African American employee regarding race relations. In the course of these conversations, I on one occasion mentioned that since many of my ancestors immigrated to the U.S. after the abolition of slavery, I didn't think any of my ancestors owned slaves. In a later conversation, I lamented my discovery that some of my ancestors did, in fact, own slaves.

47. **The Library's Allegation #16**. *"Despite the workforce tension, Plaintiff approached an African American employee to discuss his FaceBook posts…the employee indicated to Plaintiff that she did not wish to discuss the Facebook posts and would prefer to continue to work; however, Plaintiff interfered with her ability to perform her job duties and continued to discuss his Facebook posts." (p. 6 of 22).*

48. **My Response to #16**. On the day that the FaceBook posts became an issue, I made the rounds at the Library checking in on employees. When I tried to speak with the African American Employee in question, she avoided me and retreated to her office. I followed her to inquire whether her actions were related to the FaceBook posts. She responded by yelling and stating that I shouldn't have to ask and then refused to speak with me further. If she had given me an opportunity to explain the intent of the posts, perhaps she would have understood that I was making political and religious observations, not expressing negative racial ideas.

49. **The Library's Allegation #17**. *"…Plaintiff turned to Ms. Bradley and randomly stated to her and the employee that Henderson County's 'old money' came from families who farmed cash crops with slaves."(p.6 of 22).*

50. **My Response to #17**. The job evaluation in question was with a young employee who is very innovative regarding the planning of library programs and events. I was brainstorming about possible future programs when I remarked that Henderson County was at one time the third largest slave-owning county in Kentucky. I viewed this as something to be overcome and thought

9

that a program bringing together African Americans and the descendants of former slave owners could be helpful—in the nature of formal apologies that are sometimes made to descendants of the victims of racial injustice. I was motivated by a desire to bring about peace and reconciliation.

51.     **The Library's Allegation #18** *"Plaintiff told this joke in the presence of a female employee: [stranger to farmer where a female was working in the yard] 'Is that your little nagger?' Farmer: 'No, that's my wife, the nagger is in the kitchen.'" (p. 7 of 22).*

52.     **My Response to #18**. My grandfather passed away on August 30, 2018. In a short personal conversation with a coworker, I mentioned one of these "old fashioned" jokes that my grandfather would tell. The point of this reminiscence was to observe how much standards had changed; it was not related as a joke. Nothing was ever said about this until the Library's response.

53.     **The Library's Allegation #19** *"A female patron came to the library in the summer and Plaintiff commented in front of female employees about her revealing clothes and physique." (p. 8 of 22)*

54.     **My Response to #19.** As the person responsible for overall operation of the Library, it fell upon me to enforce standards regarding appropriate attire. When such occasions arose regarding female patrons, it was my practice to ask one or more female employees if they felt that the attire was inappropriate and, if so, whether it merited a conversation with the patron. I would then defer to the opinions of female co-workers. The insinuation in the Library's response is that I was addressing these issues in an inappropriate way, which is simply false.

55.     **The Library's Allegation #20** *"A different female patron brought her child to story hour. She stepped away to a quiet, private area to breast feed her infant. Plaintiff followed her, engaged in conversation with her, stared at her and made her feel uncomfortable." (p. 8 of 22)*

56.     **My Response to #20**. There is a quiet nursing area with a rocking chair in the ante-room, just outside of the women's restroom at the Library. If a nursing mother wants a quiet, private area to nurse, that is the best place. I never interacted with patrons, breastfeeding or not, in

the private ante-room outside of the women's restroom. If I ever spoke with a nursing woman, it would have been in a public area of the Library.

57. **The Library's Allegation #21**. *"An African American female employee wanted to have the annual black history month event in an area in Henderson where many African Americans reside. Plaintiff delayed the decision on the location until it was too late, and the event had to be conducted at the traditional location; the Presbyterian Church across the street from the library." (p. 8 of 22)*

58. **My Response to #21** In the last few years, the $8,000,000.00 library expansion and renovation project increasingly consumed my time. I interacted with architects, financial planners, contractors and the like. Some approvals did not occur immediately, though everything was taken care of in a timely manner. Apparently, one of these delays impacted persons interested in hosting a Black History Month event. It was, by no means, based upon the nature of the activity or the identity of the persons making the request. On February 16, 2019 Black History Month activities and crafts were done in the Children's Library at HCPL and the feature program, "Rhymes, Roots and Rhythm," featuring the Sankofa Drum and Dance Company from Nashville, occurred across the street at the Presbyterian Church. My family and I attended as well as many African Americans and individuals from many different ethnic backgrounds. This was one of the most successful Black History Month programs that the library has ever had.

59. **The Library's Allegation #22** *"The female employees stated that if you're white, male, and protestant, your ideas are good. If not, your ideas are not good." (p. 8 of 22)*

60. **My Response to #22**. This allegation is ridiculous on its face. Besides me, only one or two other employees at the library fit the description of, "white, male, and protestant." There would never be any programs, item purchases, policies, or anything else at the library if only ideas from "white, male, and protestant" were considered. As with the other allegations, none of these alleged instances were brought up prior to the FaceBook posts.

11

61.     The Library's actions against me have destroyed my professional reputation. I have applied for approximately fifty jobs in my field. I have received four interviews and no offers. Following is a list of positions for which I have applied:

a. Pensacola Christian College – Library Director

b. Dodge City Public Library – Library Director

c. Muskingum County Library System – Muskingum County Library System Director – Ohio

d. Mid-Atlantic Christian University – Library Director

e. City of Lincoln, NE – Libraries - Assistant Library Director

f. Library Director - Kiowa County Library

g. Laurel Jones County Library System, Inc,. (Director)

h. Catoosa County Library – Library Director

i. U.S. Department of the Army – Supervisory Librarian

j. Canyon Lake, TX – Library Director

k. Brewton-Parker College, Inc. - Director of Library & Information Services

l. Carolina University – Library Director

m. Billy Graham Library – Archivist

n. Librarian (Pentagon) –

o. Supervisory Librarian (NIH)

p. Cleveland Count Library System – Library Director

q. Library of Congress - Supervisory Librarian (Chief, Network Section)

r. City of Enid, OK – Library Director

s. City of Urbandale – Library Director

t. Library Adult Services Manager-City of Ames, IA

u. Eastern Oklahoma Library System – Assistant Director

v. Metropolitan Library Comm. of Okla.–Director of Outreach and Engagement Services

w. State of Louisiana – Consultant

x. Missouri Baptist University, Library Services, User & Engagement Services Specialist

y. Rosenberg Library, Library Executive Director

z. Fayetteville Public Library, Director of Development

aa. Burnet County Texas – Library Director

bb. Allen County Public Library (Indiana) – Senior Librarian – Genealogist

cc. Council Bluffs, Iowa – Library Director –

dd. Marion, IL – Library Director

ee. State Library Deputy Director – Arkansas –

ff. Lawton, OK – Deputy Library Director

gg. Library Director – Boise Public Library

hh. Librarian IV – Houston Public Library

ii. Library Director – Anderson Public Library

jj. Library Director – Jefferson County Library (MO)

kk. Librarian (NOAA) –

ll. Information Services Manager (Prince William County Libraries)

mm. Kansas Chamber of Commerce

nn. Library Branch Manager (Waco, TX)

oo. Executive Director – Mid-America Library Alliance

pp. Library Director – Grant County Public Library

qq. Central Library Manager – Garland Library

rr. Community Engagement Librarian – Mansfield Public Library (TX)

ss. Crawford County Library System Director – Crawford County, Arkansas

tt. Library Director – Beaufort County Library System

uu. Librarian – Davis Correctional Facility

vv. Library Manager – Southern Boone County Public Library Director

ww.    Archivist – Billy Graham Evangelistic Association

xx. Library Director – Newton Public Library

62.    At least one of the job recruiters told me that the Library's response to my FaceBook post will be difficult to overcome.

63.    Unless reinstated to my position, it is difficult to imagine being able to restore my professional relationship.

64.    I declare under penalties of perjury under the laws of the United States that the foregoing statements are true and correct.

/s/ Caleb H. May (see Adobe sign Audit Report)
Date: September 29, 2020