247862

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:20-CV-108-JHM

CALEB MAY                                                          PLAINTIFF

v.

HENDERSON COUNTY PUBLIC LIBRARY; *et al.*                         DEFENDANTS

---

**DEFENDANTS' SUPPLEMENTAL RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

Come the Defendants, Henderson County Public Library, Joan Hoffman, Susan Thurman, Steve Twedell, Bobbie Jarrett, and Arlene Alexander (hereinafter collectively referred to as "Defendants"), by and through counsel, and for their supplemental response to Plaintiff's Verified Motion for Preliminary Injunction [DN 6], hereby state as follows:

**SUPPLEMENTAL RESPONSE TO PLAINTIFF'S ARGUMENT**

Plaintiff's motion for preliminary injunction must be denied because he is unlikely to succeed on the merits of his First Amendment claim. To establish the prima facie elements of a First Amendment retaliation claim, a public employee must show that they engaged in constitutionally protected speech. *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Whether a public-employee plaintiff engages in constitutionally-protected speech depends on whether he is speaking as a citizen on a matter of public concern, and whether his interest in so speaking outweighs the State's interest in promoting effective and efficient public service. *Pickering v. Bd. of Educ. of Township High School Dist.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); *Fitzpatrick v. City of Frankfort*, 305 Fed.Appx. 258, 262 (6th Cir.

2

2008).  Both requirements are questions of law.  *Fitzpatrick*, 305 Fed.Appx. at 262.  In their Response [DN 10], Defendants unequivocally demonstrate that Plaintiff's speech (even assuming it had been the motive behind the decision not to renew his contract) fails to satisfy either requirement.  The United States Court of Appeals for the Sixth Circuit's recent decision in *Bennett v. Metropolitan Government of Nashville & Davidson County, Tennessee*, No. 19-5818, 2020 WL 5905067 (6th Cir. Oct. 6, 2020) confirms Defendants' argument that its interest in promoting effective and efficient public service outweighs Plaintiff's interest, if any, in commenting upon alleged matters of public concern[1].

Federal courts apply the *Pickering* test "to determine [whether] the employee's free speech interest outweigh the efficiency interest of the government as employer."  *Bennett*, 2020 WL 5905067, at *6 (citing *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017)) (internal quotations and citations omitted).  In doing so, federal courts consider whether a governmental employee's statements:

> [ (a) ] impairs discipline by superiors or harmony among co-workers, [ (b) ] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, [ (c) ] impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or [ (d) ] undermines the mission of the employer.

*Bennett*, 2020 WL 5905067, at *6 (internal quotations and citations omitted).  However, prior to applying the above-referenced factors, a court must determine "the degree of protection the speech warrants, *i.e.*, the level of importance the speech has in the community" because "the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression."  *Id*. at *5 (internal citation omitted).

---

[1] Plaintiff's Facebook posts do not address matters of public concern.  *See* Response, DN 10 PageID ##: 95-96

In *Bennett*, as in the instant case, the plaintiff alleged a governmental employer violated her constitutional rights under the First and Fourteenth Amendments when the employer terminated her for a comment posted to Facebook. *Id.* at *1. Evaluating the degree of protection the Facebook comment warranted, the Sixth Circuit identified a spectrum. Speech exposing the inner workings of government employers to the public warrants the highest degree of protection on the spectrum. *Id.* at *6. This is because the "First Amendment's focus [is] not only … a speaker's interest in speaking, but also with the public's interest in receiving information." *Id.* (internal quotations omitted). Indeed, "the employee-speech jurisprudence acknowledge[s] the importance of promoting the public's interest in receiving *well-informed* views of government employees engaging in civic discussion." *Id.* (emphasis original) (internal quotations omitted). On the opposite end of the spectrum, speech by a public employee, who has no special insight to a particular matter, requires less of a showing of disruption. *Id.*

In *Bennett*, the plaintiff, Danyelle Bennett, was terminated from her position at the Emergency Communications Center (ECC) of the Metropolitan Government of Nashville (Metro) for a Facebook comment she made on November 9, 2016 concerning the 2016 presidential election. *Id.* at *1. Bennett's Facebook comment stated, "Thank god we have more America loving rednecks. Red spread across all America. Even niggaz and latinos voted for trump too!" *Id.* Finding in favor of the public employer, the Sixth Circuit held that the employee's speech, couched in terms of political debate, did not occupy "the highest rung" of public concern, thus less of a showing of disruption to the workplace was required. *Id.* at **5-6.

As applied to the instant action, Plaintiff's speech[2] deserves minimal, if any, First Amendment protections. Plaintiff contends that Defendants took an adverse employment action

---

[2] Plaintiff's Facebook posts do not address matters of public concern. *See* Response, DN 10 PageID ##: 95-96.

against him because of four Facebook posts. (DN 6, PageID ## 52, 53, 54). None of the Facebook posts in question expose the inner workings of the government. Rather, Plaintiff's Facebook post are critical of Black Lives Matter and the Democratic Party – neither of which are government employers. In contrast to speech exposing the inner workings of government employers, Plaintiff's Facebook post merely expressed his personal beliefs that:

- "The concept of 'race' is not biblical" (*Id.* at PageID # 52);

- "There are not 'higher races of people' and 'lower races of people'" (*Id.*);

- "There is only one race, the human race" (*Id.*);

- "[T]ribes in southern Asia and eastern Africa have no trace whatever of the first foundations of all human civilization, of family life, and marriage," and that said tribes "live together in herds, like apes" (*Id.*);

- "Australians, [some Polynesian tribes], Bushmen, Hottentots, and some of the Negro tribes" are "at the lowest stage of human mental development" (*Id.*);

- "[T]he looney left aren't truly worried about COVID-19" (*Id.* at PageID # 53);

- Black Lives Matter is extremely hypocritical and actually very racist (*Id.*);

- "[M]ost people yelling Black Lives Matter have no problem with black-on-black crime, black-on-white crime, or [abortion]" (*Id.*);

- Abortion is the "liberal holocaust that murders millions of black unborn babies every year" (*Id.*);

- Individuals yelling Black Lives Matter really mean "black votes matter" (*Id.*);

- Black votes only matter to individuals yelling Black Lives Matter when black voters (1) "remain highly triggerable in election years, [(2)] don't hold democrats accountable for destroying black families and opportunities, and [(3)] remain faithful to the democratic plantation" (*Id.*); and

- "'White privilege' is a racist, divisive lie." (*Id.* at PageID # 54).

As stated *supra*, the above-referenced personal beliefs contained within Plaintiff's Facebook posts do not even address a governmental employer, much less its inner workings. Even couching Plaintiff's Facebook posts in terms of "political division" or "political debate," like the plaintiff's

5

Facebook posts in *Bennett*, Plaintiff's Facebook posts are at the lowest end of the *Bennett* spectrum requiring minimal, if any, First Amendment protection.

Moreover, Plaintiff's viewpoints are not well informed. As referenced in *Bennett*, the term "well informed" refers to the views of government employees with special insight into inner workings of government employers. *Id.* at \*6 ("Compare Bennett's comment on the election – of which she had no special insight – to the litany of cases protecting speakers that are *exposing* inner workings of government organizations to the public.") (emphasis original). Plaintiff has no special insight, by virtue of his employment or education, as to racial division, political division, protection of unborn, and public policy regarding the COVID-19 pandemic. Plaintiff is not a medical professional, nor does he have any input or behind the scene knowledge as to the Commonwealth or the federal government's public policy regarding the COVID-19 pandemic. Consequently, even if Plaintiff's speech touches public concern warranting the *Pickering* analysis, which is adamantly denied, Defendants' burden in justifying the decision to place Plaintiff on administrative leave and not renew his employment agreement is minimal at best. As Defendants' Response [DN 10] presented more than enough examples of disruptions caused by Plaintiff's Facebook posts to justify its burden, Plaintiff is unlikely to succeed on the merits of the instant action, and his Motion for Preliminary Injunction must therefore be denied.

Notwithstanding that Defendants' burden is minimal, Plaintiff's claim also fails because Defendants, like the *Bennett* defendants, made a substantial showing of workplace disruption. After holding that the *Bennett* defendants' burden was minimal, the Sixth Circuit found that the public employer in *Bennett* nonetheless made a substantial showing of workplace disruption even though not required to do so. *Id.* ("In any event, the evidence of disruption caused by the language

6

in Bennett's Facebook post was substantial.")  The Sixth Circuit held the following evidence weighed heavily in favor of the employer's decision to discharge Bennett:

- Evidence indicating that Bennett's speech impaired discipline by superiors or harmony among co-workers:

    o The Facebook comment prompted a "nonstop conversation" in the workplace that lasted for days and for as much as three weeks to a month after the comment was posted;

    o Implementation of diversity training and a diversity counselor;

    o Due to Bennett's lack of concern for her colleagues' feelings, her presence would have continued or exacerbated the disharmony; and

    o Any *inaction* on the employer's part in the face of Bennett's derogatory speech could have been seen as an endorsement of the speech and impaired *future* discipline of similar derogatory statements.  *Id.* at *7 (emphasis original).

- Evidence indicating that Bennett's speech had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary:

    o Team dynamics played an invaluable role in the success of the employer; and

    o Several ECC employees had concerns about being able to work effectively with Bennett after her Facebook comment.  *Id.*

- Evidence indicating that Bennett's speech detracted from the mission of ECC:

    o Bennett was in a public-facing role and made her comment in a public forum;

    o The fear of the comment "going viral";

    o The comment had the potential to damage public perception for the employer who served the public directly; and

    o The diverse constituents of the employer need to believe that employees are fair-minded, unbiased, and worthy of their trust.  *Id.* at **8-10.

As applied to the instant action, Defendants have presented more evidence of workplace disruption than the *Bennett* defendants presented to the district court.

Indeed, the events leading to and following Defendants' decision to place Plaintiff on administrative leave and not renew his contract demonstrate the impact of Plaintiff's Facebook

7

posts on discipline by superiors and harmony among co-workers. Like the Facebook comment in *Bennett*, which prompted a "nonstop conversation" in the workplace, Plaintiff's Facebook comment detracted, and continues to detract, from workplace harmony by triggering similar conversations amongst Library staff. The Facebook posts were made on May 30, 2020 and again on May 31, 2020. (Complaint, DN 1, ¶¶ 47-50). Roughly a week after the Facebook posts, Joan Hoffman, then Chairman of the Board of Trustees, met with Library staff via Zoom to discuss the matter and Plaintiff's performance as Director. (*See* Zoom conference, DN 10-2, DN 11). Library staff represented to Hoffman that the posts had created significant workplace tension. Despite the workplace tension, Plaintiff approached an African American employee to discuss his Facebook posts. (*Id.* at 1:03:30-1:05:30). The employee indicated to Plaintiff that she did not wish to discuss the Facebook posts and would prefer to continue to work; however, Plaintiff interfered with her ability to perform her job duties and continued to discuss his Facebook posts. (*Id.*). Similar to Bennett, who showed little remorse for her actions and attempted to justify same, Plaintiff attempted to justify the contents of his Facebook posts with an African American employee. *Bennett*, 2020 WL 5905067, at *7; Zoom conference, DN 10-2, DN 11 at 1:03:30-1:05:30. This example demonstrates that Plaintiff's Facebook posts continued to be an issue impacting the inner workings of the Library. The fact that Plaintiff is not remorseful for his actions, but instead attempts to justify same, demonstrates that the workplace disruption and disharmony is likely to continue. *Bennett*, 2020 WL 5905067, at *7.

Also, clearly indicative of the length of the "nonstop conversation," the Library Board of Trustees met on June 9, 2020 and again on June 11, 2020 to discuss Plaintiff's Facebook posts. (Minutes of the Regular Board Meeting, June 11, 2020, DN 10-1). After the Library placed Plaintiff on leave, the topic of Plaintiff's Facebook posts continued to persist at subsequent Board

meetings.  (Minutes of the Special Called Board Meeting, June 17, 2020, attached hereto as "Exhibit X"; Minutes of the Regular Board Meeting, July 9, 2020 attached hereto as "Exhibit X"). Based on the holding in *Bennett*, Plaintiff will not succeed on the merits of his claim because his Facebook posts created substantial disharmony among co-workers.

Defendants also presented substantial evidence that Plaintiff's speech had a detrimental impact on close working relationships of Library staff.  Similar to the EEC employees working with Bennett, Library staff informed Defendants that they would not be able to work effectively with Plaintiff following his Facebook posts.  Library staff also informed Defendants that:

- They did not want to be in the building with Plaintiff due to his Facebook posts (Zoom conference, DN 10-2, DN 11 at 1:03:00-2:03:012);

- They would not be able to continue to work with Plaintiff due to his Facebook posts (*Id.*);

- Plaintiff's Facebook posts also caused Library staff concern for their individual safety (*Id.* at 1:25:00-1:30:00);

- The general public associated Plaintiff's personal Facebook posts with the Library and its employees and that such an association had a negative impact on the Library employees (*Id.*);

- One employee did not go out in public following Plaintiff's Facebook posts due to retribution she faced for such comments while shopping (*Id.*); and

- They feared that Plaintiff's Facebook posts would cause protest around the Library's campus – this concern was heightened given the tension and local protest following George Floyd's death on May 25, 2020 (*Id.*).

Consequently, the holding in *Bennett* further evidences and supports Defendants' argument that Plaintiff's speech had a detrimental impact on the working relationships of the Library staff, and Plaintiff will not be successful on the merits of his claim even under a heightened standard, which unquestionably does not apply to Plaintiff's Facebook posts.

Plaintiff's Facebook posts also directly contradicted and frustrated the Library's core purpose.  Like the employer in *Bennett*, the Library serves the public directly.  The Library's

9

mission centers on providing access to information and cultural enrichment to the *entire* community. (Henderson County Public Library Strategic Plan 2015-2020: Library Mission and Vision Statement, DN 10-14, PageID #: 471). Plaintiff's Facebook posts negatively impacted the mission and goals of the Library by alienating many groups within the community, including but not limited to, Black Lives Matter supporters, NAACP members/supporters, Humans Rights Commission members/supporters, and Democrats.

The impact and damage to the Library's mission and public perception was also evident from social commentary pertaining to Plaintiff's Facebook post. Distinguishable from the Facebook comment in *Bennett*, Plaintiff's Facebook post "went viral" and was shared over 200 times prior to its removal. (Zoom conference, DN 10-2, DN 11). From June 5, 2020 to June 15, 2020, the Library received approximately 146 comments on its website. (website comments, DN 10-3; DN 10-4). An overwhelming majority of the comments called for Plaintiff's resignation or termination. (*Id.*). Local news stations and newspapers also published stories concerning the posts. (News Articles, DN 10-5). The Library's Facebook pages were also inundated with Facebook posts and messages expressing outrage over Plaintiff's Facebook posts and calling for Plaintiff's resignation. (Facebook Posts and Messages, DN 10-6). During the Zoom meeting, Library staff also represented that donors were threatening to withdraw monetary support due to Plaintiff's Facebook post and that they observed patron use and volume decreased following Plaintiff's Facebook post. (Zoom conference, DN 10-2, DN 11 at 1:11:00-1:13:00; Text Message, DN 10-8). Moreover, as the director, Plaintiff was also in a public-facing role and made his comments on a public forum. As the opinion in *Bennett* indicates, the deference federal courts must afford to this factor of the *Pickering* test and Plaintiff's conduct unquestionably detracted

from the Library's mission, this factor weighs heavily in favor of Defendants and Plaintiff will not succeed on the merits of his Complaint.

WHEREFORE, Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

KEULER, KELLY, HUTCHINS.
BLANKENSHIP, & SIGLER LLP
100 South 4th Street, Suite 400
Paducah, KY 42001
Phone 270-448-8888 / Direct: 270-448-0999
Fax 270-442-0998

By: /s/ Stacey A. Blankenship
    Stacey A. Blankenship
    Kristen N. Worak

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October, 2020, I electronically filed the foregoing with the Clerk of the Court by using the ECF system, which will send a notice of electronic filing to the following:

BRIAN SCHUETTE
SCHUETTE LAW GROUP
719 DISHMAN LANE EXT.
BOWLING GREEN, KY 42104
Email: brian@slg.legal
*Counsel for Plaintiff*

By: /s/ Stacey A. Blankenship
    Stacey A. Blankenship

11